DOUGLAS et al. v. EDWARDS, Collector of Internal Revenue.

(Circuit Court of Appeals, Second Circuit. April 7, 1924.)

No. 95.

1. **Internal revenue ⬅7—Rights neither established nor impaired by bookkeeping methods or names given items.**

For purposes of the income tax, the rights of the parties can neither be established nor impaired by bookkeeping methods or by names given to various items; whether something is capital or income, and to what year dividends should be allocated, being dependent on the subject-matter and on the statute involved, when construed in the light of constitutional requirements.

2. **Internal revenue ⬅7—Dividend declared out of depletion reserve, accruing prior to Sixteenth Amendment, held taxable as income.**

A dividend declared as capital distribution out of corporation's depletion reserve *held* taxable as income, notwithstanding it accrued prior to the effective date of the Sixteenth Amendment.

3. **Internal revenue ⬅7—Dividends conclusively presumed to be from most recently undivided profits or surplus; "deemed."**

Revenue Act 1916, § 31 (b), as added by Act Oct. 3, 1917, § 1211 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6336z), providing that any distribution to stockholders "in the year 1917, or subsequent tax years, shall be deemed to have been made from the most recently accumulated undivided profits or surplus," intended that such distribution should be conclusively presumed to have been made from the most recently accumulated undivided profits or surplus, and that corporations should not be permitted to determine to what year or to what fund it would allocate such distribution; "deemed" being equivalent to "considered" or "adjudicated."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Deem.]

4. **Internal revenue ⬅7—Dividends from depletion reserve in 1917 held taxable under 1916 rate; "surplus;" "undivided profits."**

In view of the legislative history of Revenue Act, 1916, § 31 (b), as added by Act Oct. 3, 1917, § 1211 (Comp. St. 1918, Comp. St. Ann. Supp.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

1919, § 6336z), providing that any distribution to stockholders "in the year 1917 or subsequent tax years, shall be deemed to have been made from the most recently accumulated undivided profits or surplus," the words "undivided profits or surplus" *held* not to refer to current earnings, but to undivided profits or surplus accumulated in some year prior to 1917. Hence dividends declared as capital distribution from corporation's depletion reserve in September and December, 1917, should be taxed at the 1916 rate; "surplus" meaning residue of assets after liabilities, and "undivided profits" meaning such profits as exist, but have not been distributed or otherwise used.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Surplus; Second Series, Undivided Profits.]

**5. Statutes ⊂⊃245—Not to be extended by implication.**

Provisions of statutes imposing taxes are not to be extended by implication beyond the language used.

**6. Statutes ⊂⊃224—May be construed by resorting to subsequent statutes.**

In construing statutes, resort may be had within certain limits to subsequent statutes.

**7. Internal revenue ⊂⊃7—Statute laying down rule for taxing current earnings construed.**

Revenue Act 1918, § 201 (e), being Comp. St. Ann. Supp. 1919, § 6336⅛b, enacted a plain rule of taxation of income, whereby it laid hold of current earnings as the basis of the tax, allocated any distribution during the first 60 days of any taxable year to earnings of profits accumulated during preceding years, with a rule of proportionate distribution to cover distributions made intermediate the end of the first 60 days and the date of distribution.

**8. Statutes ⊂⊃192—Technical words construed in technical sense.**

Technical words, used in reference to a subject-matter as to which they have acquired a technical meaning, are to be taken in a technical sense.

**9. Evidence ⊂⊃20(1)—Common knowledge that accumulated undivided profits or surplus cannot be ascertained without investigation.**

It is common knowledge that accumulated undivided profits or surplus cannot be ascertained without investigation, or some appropriate method of accounting or calculation.

**10. Internal revenue ⊂⊃7—What are true undivided profits or surplus held questions of fact.**

What are true accumulated undivided profits or accumulated surplus is a question of fact, and under revenue statutes that question is usually determined by the appropriate bureau of the Treasury Department, subject to such review as may be provided by statute.

**11. Constitutional law ⊂⊃70(3)—Court cannot speculate as to reasons of Congress for passing statute.**

In construing a statute, the court cannot speculate as to all the reasons actuating Congress in enacting it, but must apply the usual relevant principles of statutory construction.

**12. Statutes ⊂⊃219—Court's construction prevails over that of executive departments of the government.**

Though regulations and practices of administrative departments are entitled to weight in construing a statute, it is for the courts to construe it; and where the courts are convinced that a certain construction should be given thereto, a treasury regulation rises to no higher dignity than an expression of opinion.

In Error to the District Court of the United States for the Southern District of New York.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action at law by Archibald Douglas and others as executors of the estate of James Douglas, deceased, against William H. Edwards, Collector of Internal Revenue for the Second District of New York. Judgment entered on directed verdict for defendant, dismissing the complaint (287 Fed. 919), and plaintiffs bring error. Reversed, with directions.

Writ of error to a judgment of the District Court for the Southern District of New York, entered on a directed verdict in favor of defendant, dismissing the complaint, and awarding costs against plaintiffs to defendant. The facts having been stipulated, only questions of law were in controversy, and each side, therefore, moved for the direction of a verdict, with the result supra.

The action was brought to recover $173,579.72, additional income tax for 1917, paid under protest by plaintiffs to defendant collector. A claim for refund was duly made and denied. The additional tax was levied on two so-called depletion distributions made in September and December, 1917, by Phelps Dodge Corporation, a mining company, and received in his lifetime by James Douglas, a stockholder. It is contended by plaintiffs that these dividends were not income, and therefore not taxable, or, if income and taxable, then not at the 1917 rate, while defendant insists that the dividends were taxable as income and at the 1917 rate.

Phelps, Dodge & Co., Inc., was organized under the laws of New York on December 14, 1908, with an authorized capital stock of $50,000,000, divided into 500,000 shares, of the par value of $100 each. $45,000,000 par value was issued for $90,000,000 of assets, of which $66,000,000 represented copper and coal mines and $24,000,000 other assets. The corporation thus had a capital stock of $45,000,000 and a paid-in surplus of $45,000,000. These assets were held by various subsidiary companies, but the history and relation of these companies need not be recited, as the parties agree that these antecedent details do not affect the controversy. By March 1, 1913, the assets of the corporation had increased in value to $153,275,606.69, of which $132,285,000 represented the value of its mines, and the balance represented the plant investments and other current assets.

On March 1, 1913, Douglas held 41,025 shares of the capital stock of Phelps, Dodge & Co., Inc. On July 2, 1913, he purchased 25 additional shares of such stock. He held this stock until April 1, 1917, when in the reorganization infra he exchanged his 41,050 shares in Phelps, Dodge & Co., Inc., for 41,050 shares in Phelps Dodge Corporation, which shares he held continuously until his death on June 25, 1918. On April 1, 1917, the business was reorganized in a manner not material to the issues here involved and Phelps Dodge Corporation (hereinafter called Phelps Co.) became the name of the reorganized company and became the parent company. For brevity and convenience, Phelps Co. will be understood to refer to the present and previous corporations.

From 1913 to 1917, inclusive, the mines owned by Phelps Co. were operated and the product sold, and in each year a certain amount was deducted from gross income and credited on the books of the company to a depletion reserve account. to make good the wastage caused by the operation of the mines. In 1918, Phelps Co. filed its income and excess profits tax returns for the year 1917. On December 1, 1919. the Commissioner of Internal Revenue made a provisional valuation for depletion and other purposes of the various mining properties owned as of March 1, 1913. It was held that Phelps Co. had an outstanding capital stock of $45,000,000, a paid-in surplus of $45,000,000, and the "total value fixed by the bureau as of March 1, 1913," of all the company's mines was $132,285,000.

Upon the basis of the foregoing valuation, the income and excess profits tax returns of Phelps Co. for the years 1917 and 1918 were audited and closed by the Commissioner of Internal Revenue and the tax paid. These taxes of the corporation were adjusted to make them correspond with the revised depletion figures. Phelps Co. had set up on its books a depletion reserve from 1913 to 1917, inclusive, which for these years aggregated 14,416,783.88. This

depletion reserve was revised by the Commissioner of Internal Revenue, and increased for this period to $25,837,427.91. The summary memorandum of the changes in financial conditions of Phelps Co. from 1912 to 1917 is noted in the table following for convenient reference:

Plaintiff's Exhibit D.

Phelps Dodge Corporation.

Memorandum re Changes in Financial Condition—1912-1917.

| | 1912 | 1913 | 1914 | 1915 | 1916 | 1917 | Total |
|---|---|---|---|---|---|---|---|
| Income, before deducting depletion | | 11,120,368.73 | 8,216,266.66 | 10,501,310.77 | 23,675,783.01 | 22,456,906.32 | 75,970,635.49 |
| Depletions, at Treasury Department's rates | | 4,747,251.87 | 4,572,808.56 | 4,877,786.88 | 5,925,161.34 | 5,714,419.26 | 25,837,427.91 |
| Profits | | 6,373,116.86 | 3,634,458.10 | 5,623,523.89 | 17,750,621.67 | 16,742,487.06 | 50,133,207.58 |
| Dividends paid from earned surplus | | 7,425,000.00 | 6,300,000.00 | 9,000,000.00 | 14,625,000.00 | 10,800,000.00 | 48,150,000.00 |
| Distributions of proceeds of depletion | | ...... | ...... | ...... | ...... | 3,600,000.00 | 3,600,000.00 |
| Total Distributions to stockholders | | 7,425,000.00 | 6,300,000.00 | 9,000,000.00 | 14,625,000.00 | 14,400,000.00 | 51,750,000.00 |
| Capital expenditures: | | | | | | | |
| Mines | | 678,421.98 | 183,796.91 | 483,141.54 | 1,508,138.54 | 3,796,653.03 | 6,287,558.18 |
| Plants | | 1,088,392.37 | 1,435,008.46 | 1,663,945.69 | 1,508,655.32 | 1,414,682.28 | 7,115,684.12 |
| Investments | | 136,386.38 | 330,213.44 | 4,893.00 | 249,101.17 | 585,267.02 | 77,945.79 |
| Total capital expenditures | | 1,903,200.73 | 1,860,998.11 | 2,152,694.23 | 2,767,692.69 | 5,796,602.33 | 13,481,188.09 |
| Balance sheets, 31st December: | | | | | | | |
| Mines | $132,285,000.00 | 128,216,170.11 | 123,459,564.64 | 119,069,919.30 | 114,652,896.50 | 112,735,130.27 | |
| Plants | 5,281,367.23 | 5,911,154.45 | 8,253,313.46 | 9,440,549.51 | 10,455,211.45 | 11,484,535.18 | |
| Investments | 3,151,535.24 | 3,287,921.62 | 2,897,708.18 | 2,893,315.18 | 2,644,214.01 | 3,129,431.03 | |
| Current assets derived from depletion | ...... | 4,063,829.89 | 8,825,435.36 | 13,265,080.70 | 17,632,103.50 | 15,949,869.73 | |
| Current assets—other | 12,557,704.22 | 10,739,647.48 | 6,131,155.01 | 1,521,840.85 | 3,931,901.75 | 8,359,798.06 | |
| Total assets | $153,275,606.69 | 152,223,723.55 | 149,567,181.65 | 146,190,705.54 | 149,316,327.21 | 151,658,814.27 | |
| Capital stock | $ 45,000,000.00 | 45,000,000.00 | 45,000,000.00 | 45,000,000.00 | 45,000,000.00 | 45,000,000.00 | |
| Surplus—prior to 1913 | 108,275,606.69 | 107,223,723.55 | 104,567,181.65 | 101,190,705.54 | 101,190,705.54 | 97,590,705.54 | |
| —since 1913 | ...... | ...... | ...... | ...... | 3,125,621.67 | 9,068,108.73 | |
| Total capital | $153,275,606.69 | 152,223,723.55 | 149,567,181.65 | 146,190,705.54 | 149,316,327.21 | 151,658,814.27 | |

In 1913, after deducting the depletion fixed by the Commissioner of Internal Revenue, Phelps Co. earned a net profit of $6,373,116.86. Total distributions to stockholders in 1917 aggregated $7,425,000, or $1,051,883.14 more than its net profit. Obviously, this excess must have been paid out of surplus which it had on hand at the beginning of the year—i. e., surplus accumulated prior to March 1, 1913—since there was no other fund from which it could have been paid. The result was that the surplus at the end of 1913 decreased from $108,275,606.79 to $107,223,723.55. or by $1,050,883.14, the exact amount by which the distributions paid to stockholders exceeded the profits. By following Exhibit D, it will be noted that by the end of 1915 Phelps Co. had paid out of its profits since March 1, 1913, and, in addition, out of surplus accumulated prior to that date, a sum aggregating $7,084,901.15, the amount by which the distributions paid to 1913, 1914, and 1915 exceeded the amount of profits earned in those years.

In 1916 the situation changed. In that year the company earned a net profit of $17,750,621.67 over its depletion deduction and paid dividends amounting to $14,625,000. It therefore had an excess of profits over dividends of $3,125,- 621.67. In 1917 the company earned net profits of $16,742.487.06 and paid regular dividends of $10,800,000. At a meeting of the board of directors of the company, on September 13, 1917, the company passed a resolution which recited that it had yearly, in computing its income, deducted therefrom a reasonable allowance for depletion of its mines, based upon the fair market value thereof as of March 1, 1913, and that the statutes and department rulings provided for a separation of these deductions from income, and that payments to stockholders from the depletion account would be a return of capital invested, and not subject to income tax in the hands of the shareholders, and thereupon it resolved:

"That this company distribute among its stockholders, from said depletion account, $3 a share, to be paid on September 28, 1917, to stockholders of record on September 24, 1917, the total amount so paid to be deducted from said depletion account."

In December, 1917, a similar resolution was passed, this time, however, distributing $5.00 per share to the stockholders. The total distribution of these so-called depletion dividends aggregated $3,600,000, and the amounts received by Douglas were, respectively, $123,150 and $205,250, or a total of $328,400. The return of Phelps Co. for the year 1917 was audited on or about March 2, 1920, and the 1917 income and excess profit taxes of Phelps Co. were finally determined on or about that date.

Douglas in his 1917 income tax return included in his taxable income all dividends received from Phelps Co., except the two so-called depletion dividends of September 28 and December 28, 1917. He inserted, however, in making up his return, a note showing the receipt of these so-called depletion dividends. It was upon this sum of $328,400 that the Commissioner of Internal Revenue assessed an additional income tax, and this was the additional income tax paid to defendant by the executors of Douglas on May 16, 1919, which is the subject-matter of this controversy. It will also be observed that the income for 1917, before deducting depletion, was $22,456,906.32. After deducting the sum of $5,714,419.26, the amount of depletion at Treasury Department rates, the remainder upon that basis, representing the earnings or profits for 1917, was the sum of $16,742,487.06. Adding together the total of dividends stated in Exhibit D to have been paid from earned surplus—i. e., $10,800,000 to the sum of $3,600,000, being the amount of so-called depletion distributions—the total is $14,400.000. Deducting this last-named amount from the sum of $16,742,487.06 supra, there still remained a balance of 1917 earnings of $2,342,487.06.

Certain amounts were set up by the corporation on its books contemporaneously with the declaration and payment of the so-called depletion dividends and various entries made. The statute particularly requiring construction reads as follows:

"Sec. 31 (a).. That the term 'dividends' as used in this title shall be held to mean any distribution made or ordered to be made by a corporation, * * * out of its *earnings or profits accrued since March first, nineteen*

*hundred and thirteen,* and payable to its shareholders, whether in cash or in stock of the corporation, \* \* \* which stock dividend shall be considered income, to the amount of the *earnings or profits* so distributed.

"Sec. 31 (b). Any distribution made to the shareholders or members of a corporation, \* \* \* in the year nineteen hundred and seventeen, or subsequent tax years, *shall be deemed* to have been made from the *most recently accumulated undivided profits or surplus,* and shall constitute a part of the annual income of the distributee for the year in which received, and shall be taxed to the distributee at the rates prescribed by law for the years in which such profits or surplus *were accumulated* by the corporation, \* \* \* but nothing herein shall be construed as taxing any *earnings or profits accrued prior to* March first, nineteen hundred and thirteen, but *such earnings or profits* may be distributed in stock dividends or otherwise, exempt from the tax, *after* the distribution of *earnings and profits accrued* since March first, nineteen hundred and thirteen, has been made. This subdivision shall not apply to any distribution made prior to August sixth, nineteen hundred and seventeen, out of *earnings or profits accrued* prior to March first, nineteen hundred and thirteen." (Italics ours.) 40 Stat. 337, 338 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6336z).

Douglas, Armitage & McCann, of New York City (Matthew C. Fleming, Archibald Douglas, Paul Armitage, and Edward Holloway, all of New York City, of counsel), for plaintiffs in error.

William Hayward, U. S. Atty, of New York City (Richard S. Holmes, Sp. Asst. U. S. Atty., of New York City, of counsel), for defendant in error.

George E. Holmes, of New York City (Randolph E. Paul and Donald Havens, both of New York City, of counsel), amicus curiæ.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). We have not considered it necessary to set forth the details of various entries and accounts as they were made and carried on the books of Phelps Co., and in respect of which counsel have presented various arguments.

[1] There is no question of good faith in regard to these entries; but it is well at the outset to realize that, in this case, the rights of the parties can neither be established nor impaired by the bookkeeping methods employed, or by the names given to the various items. Whether something is capital or income, and to what year dividends should be allocated, depends partly upon the subject-matter and partly upon the statute involved, when construed in the light of constitutional requirements.

[2] 1. The first contention is that the two so-called depletion distributions were of capital to the stockholders, and hence not taxable under the Sixteenth Amendment of the Constitution of the United States. On March 1, 1913, Douglas owned 41,025 shares of Phelps Co. On July 2, 1913, he acquired 25 more shares. These 41,050 shares he owned in 1917, when he received his proportion upon the distribution of the so-called depletion dividends.

Plaintiffs insist that the fund set aside from time to time for the depletion reserve was capital. There is no controversy as to the various amounts under this head set forth in plaintiffs' Exhibit D, because they

are not mere arbitrary entries by Phelps Co.; but they have been audited and determined by the appropriate department of the government. The assertion of plaintiffs, briefly stated, is that the two depletion distributions were a partial realization of an investment made by Douglas years prior to 1917, and represented the gradual increase which had arisen before the effective date of the Sixteenth Amendment, and thus were not taxable as income, gains, or profits. Defendant necessarily concedes that, if these distributions were a return of capital, then they were not income of the stockholder, Douglas, and hence not taxable.

Counsel have indulged in arguments somewhat elaborate, and have sought to fortify them by references to books on accounting and discussions in respect of the distinctions between capital and income. We need not, however, be led into these controversial paths; for the determination of this question rests upon the understanding of two cases decided by the Supreme Court of the United States, argued at the same time and decided on the same day.

In Lynch v. Turrish, 247 U. S. 221, 38 Sup. Ct. 537, 62 L. Ed. 1087, there was a complete liquidation and winding up. The property of the corporation there concerned had increased in market value, with the result that the market value of its shares had increased to twice par value by March 1, 1913. Later the company sold all its property and made final distribution of the proceeds to the shareholders on surrender of their certificates of stock. The amount thus received by each shareholder was twice the par value of his shares, but represented no increase since the effective date of the act of October 3, 1913, 38 Stat. 166. The Supreme Court held that the value thus received was not "income, gains or profits" of the shareholders, subject to the tax.

In Lynch v. Hornby, 247 U. S. 339, 38 Sup. Ct. 543, 62 L. Ed. 1149, it appeared that Hornby from 1906 to 1915 was the owner of 434 shares of the capital stock of a lumber company. On or prior to March 1, 1913, owing to the increase in value of the timber lands of this company and through its business operations, the property had greatly increased in value, and Hornby's stock had become worth nearly four times its par value. In 1914, the company distributed dividends aggregating $650,000, of which $240,000, or 24 per cent. of the par value of the capital stock, was derived from current earnings, and $410,000 from conversion into money of property that it owned or in which it had an interest on March 1, 1913. Hornby's share of the latter amount was $17,794, and this was the amount which was the subject-matter of the suit.

Mr. Justice Pitney, writing for the court, definitely distinguished the case from the Turrish Case, supra, calling attention to the fact that in the latter case there was a single and final dividend received by Turrish in liquidation of the entire assets of the business of the company of which he was a shareholder, and thus a return to him of the value of his stock upon the surrender of his entire interest in the company at a price which represented its intrinsic value at and before March 1, 1913, when the then Income Tax Act took effect. In the Hornby Case, there was no winding up or liquidation, nor any surrender of Hornby's

stock. The court pointed out the difference between a stockholder's undivided share in the profits of a corporation prior to the declaration of a dividend and his participation in the dividends declared and paid, as follows:

"It is evident that Congress intended to draw and did draw a distinction between a stockholder's undivided share or interest in the gains and profits of a corporation, prior to the declaration of a dividend, and his participation in the dividends declared and paid; treating the latter, in ordinary circumstances, as a part of his income for the purposes of the surtax, and not regarding the former as taxable income unless fraudulently accumulated for the purpose of evading the tax. * * * The stockholder is, in the ordinary case, a different entity from the corporation, and Congress was at liberty to treat the dividends as coming to him ab extra, and as constituting a part of his income when they came to hand."

In concluding the opinion the court said:

"Lynch v. Turrish and Southern Pacific Co. v. Lowe rest upon their special facts and are plainly distinguishable."

Prior to and after the Turrish and Hornby Cases, the Supreme Court had occasion to consider, upon other facts and other provisions of statute law, what was capital and what taxable income, and in what respects there were certain distinctions between a corporation and its stockholders. Some of these cases were Collector v. Hubbard, 12 Wall. 1, 20 L. Ed. 272; Bailey v. Railroad Co., 22 Wall. 604, 22 L. Ed. 840, and also 106 U. S. 109, 1 Sup. Ct. 62, 27 L. Ed. 81; Gray v. Darlington, 15 Wall. 63, 21 L. Ed. 45; Merchants' L. & T. Co. v. Smietanka, 255 U. S. 509, 41 Sup. Ct. 386, 65 L. Ed. 751, 15 A. L. R. 1305; Eldorado Coal Co. v. Mager, 255 U. S. 522, 41 Sup. Ct. 390, 65 L. Ed. 757; Walsh v. Brewster, 255 U. S. 536, 41 Sup. Ct. 392, 65 L. Ed. 762. See, also, opinion of Lowell, D. J., in Merchant's Ins. Co. v. McCartney, 17 Fed. Cas. 46, a case arising out of the act of June 30, 1864, 13 Stat. 281.

After examination of these and other cases, we are unable to distinguish the case at bar from the Hornby Case. Much is made by plaintiffs in error of expressions used in the Hornby Case, to the effect that the dividends in question were "received in the ordinary course by a stockholder from a corporation" and were declared and paid "in the ordinary course of business." As we read the Hornby Case, these expressions were clearly explained by the context, for the court said that, though these dividends were extraordinary in amount and "might appear upon analysis to be a mere realization in possession of an inchoate and contingent interest that the stockholder had in a surplus of corporate assets previously existing," yet they were taxable. The court also, in using the expression as to "ordinary course of business" was plainly distinguishing the Hornby Case from other cases some of which were contemporaneously decided where there was a different situation than the mere declaration of a dividend or analogous distribution. In the Turrish Case, as has been stated, there was a final liquidation. In Southern Pacific Co. v. Lowe, 247 U. S. 330, 38 Sup. Ct. 540, 62 L. Ed. 1142, there was, inter alia, a question of real as contrasted with technical ownership. In Peabody v. Eisner, 247 U. S. 347, 38 Sup. Ct. 546, 62 L. Ed. 1152, the question was wheth-

er a dividend by a corporation of shares owned by it in another corporation was a stock dividend.

On this branch of the case at bar, therefore, we think the question argued is ruled by authority, and for that reason further discussion seems unnecessary.

[3, 4] 2. The question which arises under section 31 (b) of the act of 1917, passed October 3, 1917, is whether Douglas should have been taxed at the 1917 rate, or at the rate prevailing in some year prior to 1917. The controversy revolves around the meaning of the expression, "most recently accumulated undivided profits or surplus." There is also a difference of opinion as to the meaning of the word "deemed."

We may dispose at the outset of the meaning of "deemed." If it had been intended that this word should mean a rebuttable and not a conclusive presumption, the word "presumed" could readily have been used, and that is a word which is very familiar in many statutes. "Deemed," and its synonym, "regarded," according to definitions in cases and dictionaries, is the equivalent of "considered" or "adjudged." Leonard v. Grant (C. C.) 5 Fed. 11, 16; U. S. v. Doherty (D. C.) 27 Fed. 730, 734; Michel v. Nunn (C. C.) 101 Fed. 423; Cardinel v. Smith, 5 Fed. Cas. 45, 47; Walton v. Cavin, 16 Q. B. 48, 81.

We think it was the purpose of the statute that any distribution made to shareholders should be conclusively presumed to have been made from the most recently accumulated undivided profits or surplus, and that it was intended that the corporation should not be permitted to determine to what year or period or to what fund it would allocate such distribution. Any other construction might well have led to confusion and inequalities.

Defendant in error contends that the statute means that, if a distribution was made on or after August 6, 1917, during the year 1917, and if the amount thus distributed was equal to or exceeded the current earnings for the year 1917, then the taxpayer stockholder was taxable at the 1917 rate. Plaintiffs in error contend, on the contrary, that the statute did not refer to current earnings, but to undivided profits or surplus accumulated in some year prior to 1917, and in the year wherein such undivided profits or surplus had most recently been accumulated.

[5] An examination of sections 31 (a) and 31 (b) at once discloses that the Congress used the words "earnings or profits" six times, whereas, when referring to the rates applicable to the distributee, it used entirely different phraseology; i. e., "most recently accumulated undivided profits or surplus" and "for the years in which such profits or surplus were accumulated." It cannot be assumed that these words were used carelessly, nor can the statute be approached with the presumption that the Congress intended that this phraseology should be equivalent to that which would express current earnings or profits. The time-worn observation may be indulged in that, if the Congress had intended to say "earnings or profits" as referring to current earnings, it could readily have done so by using these words so long familiar in taxing statutes. The language used in a taxing statute is always a matter of prime importance, and the rule has recently again been

stated in United States v. Merriam, 263 U. S. 179, 44 Sup. Ct. 69, 71, 72, 68 L. Ed. ——. In that case, Mr. Justice Sutherland, speaking for the court, said:

"On behalf of the government it is urged that taxation is a practical matter, and concerns itself with the substance of the thing upon which the tax is imposed, rather than with legal forms or expressions. But in statutes levying taxes the literal meaning of the words employed is most important, for such statutes are not to be extended by implication beyond the clear import of the language used. If the words are doubtful, the doubt must be resolved against the government and in favor of the taxpayer. Gould v. Gould, 245 U. S. 151, 153, 38 Sup. Ct. 53, 62 L. Ed. 211. The rule is stated by Lord Cairns in Partington v. Attorney General, L. R. 4 H. L. 100, 122: 'I am not at all sure that in a case of this kind—a fiscal case—form is not amply sufficient, because, as I understand the principle of all fiscal legislation, it is this: If the person sought to be taxed comes within the letter of the law, he must be taxed, however great the hardship may appear to the judicial mind to be. On the other hand, if the crown, seeking to recover the tax, cannot bring the subject within the letter of the law, the subject is free, however apparently within the spirit of the law the case might otherwise appear to be. In other words, if there be admissible in any statute what is called an equitable construction, certainly such a construction is not admissible in a taxing statute, where you can simply adhere to the words of the statute.' And see Eidman v. Martinez, 184 U. S. 578, 583, 22 Sup. Ct. 515, 46 L. Ed. 697."

The cases, like Bank of Commerce v. Tennessee, 161 U. S. 134, 146, 16 Sup. Ct. 456, 40 L. Ed. 645, and Cornell v. Coyne, 192 U. S. 418, 431, 24 Sup. Ct. 383, 48 L. Ed. 504, in which the doubt is resolved in favor of the government and against the taxpayer, are those in which the taxpayer claims an exemption or a privilege. That is not this case. Here, so far as concerns, in this regard, the construction of section 31 (b), plaintiffs do not ask for an exemption or privilege; on the contrary, they assert that, as matter of right under the statute, the deceased shareholder should have been taxed at other than the 1917 rate.

[6] It is an accepted principle that for purposes of statutory construction, within certain limits, resort may be had to subsequent statutes. United States v. Field, 255 U. S. 257, 41 Sup. Ct. 256, 65 L. Ed. 617, 18 A. L. R. 1461; Smietanka v. First Trust & Savings Bk., 257 U. S. 602, 42 Sup. Ct. 223, 66 L. Ed. 391; Shwab v. Doyle, 258 U. S. 529, 42 Sup. Ct. 391, 66 L. Ed. 747, 26 A. L. R. 1454; Monroe Cider, Vinegar & Fruit Co. v. Riordan (C. C. A.) 280 Fed. 624; Irwin v. Gavit (2d Circuit, C. C. A., decided Dec. 10, 1923) 295 Fed. 84.

[7] Availing of this principle, the parties each seek comfort in the Revenue Act of 1918. Defendant urges that the omission in the Revenue Act of 1918 of the words "undivided profits or surplus" and the use of the words "earnings or profits," as applied to accumulations, clarified section 31 (b) of the Revenue Act of 1917. We agree that there was clarification, but not of the kind urged by defendant, unless "undivided profits or surplus," as used in the statute of 1917, meant the same thing as current earnings or profits. We realize that the definition of "surplus" and "undivided profits" may be of some importance, but the real emphasis should be upon the expression "*most recently accumulated* undivided profits or surplus," and to this we shall refer infra.

In section 201 (b) of the Revenue Act of 1918 (Comp. St. Ann. Supp. 1919, § 6336⅛b), it is provided inter alia:

"Any distribution shall be deemed to have been made from *earnings* or *profits* unless all *earnings* and *profits* have first been distributed. Any distribution made in the year 1918 * * * shall be deemed to have been made from *earnings* or *profits* accumulated since February 28, 1913." (Italics ours.)

In section 201 (d) of the same act, it is provided, inter alia, that dividends to shareholders—

"shall * * * be taxed to the recipient at the rates prescribed by law for the years in which the corporation accumulated the *earnings* or *profits* from which such dividend was paid, but the dividend shall be deemed to have been paid from the *most recently accumulated earnings or profits.*" (Italics ours.)

Then follows, perhaps, the most significant provision of section 201 of the act of 1918, i. e., subdivision (e), because this subdivision removes any doubt in that act as to what is meant by "accumulated earnings or profits" and lays down a new and perfectly clear method of prorating. This subdivision (e) reads as follows:

"Any distribution made during the first sixty days of any taxable year shall be deemed to have been made from earnings or profits accumulated during preceding taxable years; but any distribution made during the remainder of the taxable year shall be deemed to have been made from earnings or profits accumulated between the close of the preceding taxable year and the date of distribution, to the extent of such earnings or profits, and if the books of the corporation do not show the amount of such earnings or profits, the earnings or profits for the accounting period within which the distribution was made shall be deemed to have been accumulated ratably during such period."

In this 1918 act it is apparent that the Congress, for reasons deemed wise, enacted a plain rule of taxation whereby it laid hold of current earnings as the basis of the tax, allocated any distribution made during the first 60 days of any taxable year to earnings or profits accumulated during preceding taxable years, and, inter alia, set up a rule of proportionate distribution to cover distributions, made as in the case at bar, intermediate the end of the first 60 days of the year (approximately March 1st) and the date of distribution, to the extent of such earnings or profits, as might have been accumulated between the close of the preceding taxable year and the date of distribution. This same provision was repeated and again enacted in section 201 (f) of the act of 1921 (Comp. St. Ann. Supp. 1923, § 6336⅛b).

Notwithstanding that in these two subsequent acts the Congress found it necessary, not only specifically to set forth a rule of taxation, but to use different language from what it had employed in the 1917 act, defendant here is seeking to apply the provisions of section 201, particularly of subdivision (e), of the 1918 act, to the facts in the case at bar upon the insistent argument that "most recently accumulated earnings or profits," as used in the 1918 act, meant precisely the same as "most recently accumulated undivided profits or surplus," as used in the 1917 act, and defendant to press the argument has been compelled to devise somewhat elaborate tables to show the financial status of Phelps Co. at the date of distributions in September and December, 1917.

In section 207 (a) (3) of the 1917 act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6336⅜h), relating to the war excess profits tax and defining "invested capital," reference is made to "paid in or earned surplus and undivided profits * * * earned during the taxable year." The subject-matter of this section is entirely different from that of the statute here under consideration, and, if any argument is to be rested thereon, it would be that, in 1917, the Legislature demonstrated its intent to exclude undivided profits contemporaneously. earned; i. e., during the current taxable year.

[8] It is a well-established rule of statutory construction that, if technical words are used in a statute in reference to a subject-matter as to which they have acquired a technical meaning, they are to be taken in a technical sense. 36 Cyc. 118, and cases cited.

Coming, then, to the meaning of "surplus" and "accumulated surplus," it will be found that these words have been defined or interpreted on many occasions in connection with the consideration of some particular statute. Leather Manufacturers' Nat. Bk. v. Treat (C. C.) 116 Fed. 774; Anderson v. Farmers' Loan & Trust Co., 241 Fed. 322, 154 C. C. A. 202; McConnell v. Allen, 120 App. Div. 548, 105 N. Y. Supp. 16; Mutual Ben. Life Ins. Co. v. Utter, 34 N. J. Law, 489, 491; People's Fire Ins. Co. v. Parker, 34 N. J. Law, 479, 482; People's Fire Ins. Co. v. Parker, 35 N. J. Law, 575, 577; Trenton Iron Co. v. Yard, 42 N. J. Law, 357, 359; Goodnow v. American Writing Paper Co., 73 N. J. Eq. 692, 69 Atl. 1014; Mills v. Britton, 64 Conn. 4, 29 Atl. 231, 236, 24 L. R. A. 536; Equitable Guarantee & Trust Co. v. Rogers, 7 Del. Ch. 398, 44 Atl. 789, 793; Hunter v. Hersperger, 96 Md. 292, 54 Atl. 65, 67; Towery v. McGaw (Ky.) 56 S. W. 727, 728.

"Surplus" has also been the subject-matter of construction in cases, inter alia, involving insurance policies and decedents' estates. Books and essays on accounting, of which many are referred to by counsel, define and explain in accordance with the view of the particular author the meaning of "surplus," "surplus earnings," "surplus account," and similar expressions. Thus it is that general definitions will be found, which may be accurate for the purposes of the discussion of a particular subject-matter by a court, or text-book writer, or essayist, but which may not be applicable to some other case. The case at bar does not call for an academic discussion of accounting or bookkeeping methods, nor for a comparison of definitions found in adjudicated cases.

Two simple definitions, readily understood and not embarrassed by any abstruse complication, may be found in cases in this circuit. In Leather Manufacturers' Nat. Bk. v. Treat (C. C.) 116 Fed. 774, Judge Lacombe, in discussing a provision of the War Revenue Act of 1898 (30 Stat. 448) affecting bankers, said:

"It would seem, rather, that Congress used the word 'surplus' in its ordinary sense, as indicating the amount left over after setting aside sufficient of the assets of a banker to meet his liabilities."

Judge Augustus N. Hand, in Anderson v. Farmers' Loan & Trust. Co., 241 Fed. 322, 154 C. C. A. 202, speaking for this court, in refer-

ring to the words "capital, surplus and undivided profits," used in the statute there under consideration, said that these words related "to no particular kind of property, but are expressions describing the amount of the residue of the assets after the liabilities have been deducted."

For the purposes of this case, either definition supra will do. The expression "undivided profits" is for all practical purposes of this statute synonymous with "surplus" and certainly with "accumulated surplus." It means such profits as exist and have or have not been ascertained, but, in any event, have not been distributed or otherwise used and is distinguishable from current earnings or profits.

[9] It is matter of common knowledge, and, indeed, an obvious fact, that accumulated undivided profits or surplus cannot be ascertained without investigation or some appropriate method of accounting or calculation. The ordinary methods of corporate accounting in this regard have been recognized by the Supreme Court. Thus, in Eisner v. Macomber, 252 U. S. 189, at page 209, 40 Sup. Ct. 189, at page 194 (64 L. Ed. 521, 9 A. L. R. 1570), Mr. Justice Pitney said:

"For bookkeeping purposes, the company acknowledges a liability in form to the stockholders equivalent to the aggregate par value of their stock, evidenced by a 'capital stock account.' If profits have been made and not divided, they create additional bookkeeping liabilities under the head of 'Profit and Loss,' 'Undivided Profits,' 'Surplus Account,' or the like."

And Mr. Justice Brandeis, in his dissenting opinion, used, in the course of his discussion, language and illustrations familiar in usual corporate accounting and bookkeeping methods.

[10] A corporation does not ordinarily set up on its books in the intermediate course of a year the amount of its accumulated surplus or undivided profits. It is manifestly impracticable from month to month to take inventories or compile data to ascertain what surplus or undivided profits have been accumulated for a fraction of a current year. Accumulated surplus or undivided profits are ordinarily ascertained at the end of a given calendar or fiscal year. What are the true accumulated undivided profits, or what is the true accumulated surplus, is always a question of fact, and, under a revenue statute, that question of fact is usually determined by the appropriate bureaus of the Treasury Department, subject to such review as may be provided by statute. A person or a corporation really does not know what are the profits of his or its business until the conclusion of some fixed period, whether it be a calendar or fiscal year. If a corporation on February 1st of any year were to distribute in dividends profits made in the January immediately preceding, it might find that all these profits would, for one reason or another, be wiped out in March of the same year. If, on the other hand, the "undivided profits or surplus" accumulated in January were not distributed, it would be a misnomer to say that on February 1st of the same year there was on hand accumulated undivided profits or surplus for the month of January. In literal language, that might be true, because the undivided profits or surplus of January would have been accumulated, in the sense that they had not been distributed. In taxing statutes, however, as in most other matters regulated by law, we do not deal in abstractions, and an

298 F.—16

income tax statute usually provides for fixed periods as the measure of calculation and obligation, and this is because business, large and small, is done that way and no man in active business can tell where he stands financially for a given time, whether it be a calendar year or fiscal year, or some other definite period, until he shall have arrived at the end of that period, and is then able on facts known or ascertainable to determine, with reasonable approach to accuracy, what is his financial condition.

Section 201 (e) of the 1918 act recognized all this, and strikingly so in respect of the first 60 days. The Congress must have realized that dividends declared during January and February would ordinarily be declared out of the accumulated undivided profits or surplus of a preceding year. The Legislature also recognized that a corporation declaring a dividend in any particular year would ordinarily declare it out of the surplus or undivided profits accumulated in some previous year, and therefore, in section 201 (e), created a rule of taxation based on a system of accounting and dividend distribution not common in ordinary corporate business.

In 1918 the Congress had the benefit of the experience of 1917, and indeed of the whole of the year 1918 (because the act of 1918 did not become law until February 24, 1919), and found it necessary to apply, in some respects, more drastic taxation requirements. Under the act of 1917, however, the sole preferred class comprised those corporations which prior to August 6, 1917, had made distributions out of earnings or profits accrued prior to March 1, 1913. A corporation which had made its distribution on February 1, 1917, and which had earnings or profits which had accrued subsequent to March 1, 1913, was precisely in the same situation as a corporation which made its distribution on December 31, 1917, in like circumstances. Yet, if the contention of the defendant were to prevail, it would lead to the conclusion that the Congress in 1917 meant to apply the 1917 rate to the shareholder who received a dividend from the corporation making a distribution on February 1, 1917, notwithstanding that, in similar circumstances, the rates of preceding taxable years and not of the current year were applicable under section 201 (e) of the act of 1918, where the corporation made its distribution on February 1, 1918.

[11] Various arguments are advanced by each side as to the reason for the legislation contained in section 31 (b) of the 1917 act. Plaintiffs contend, inter alia, that this legislation was intended to release to shareholders for investment in Liberty Bonds and other war purposes sums which had been accumulated by the corporations prior to January 1, 1917. Defendant contends, inter alia, that because of war needs the conclusion is irresistible that the shareholders were to be taxed at the rates of the 1917 act, which had increased greatly over those of the 1916 and 1913 acts. We cannot, however, indulge in speculation as to all the reasons which actuated the Congress in enacting a particular statute. We must find solution by applying the usual relevant principles of statutory construction.

Under the act of October 3, 1913, all dividends distributed after March 1, 1913, were taxable, whether the profits out of which such

dividends were declared were accumulated before or after that date. Although the World War had begun and economic conditions had been disturbed, the Revenue Act of 1916 permitted the declarations of dividends out of surplus accumulated prior to March 1, 1913, tax free, even though profits earned subsequent to March 1, 1913, remained undistributed. This history throws some light on the controversy, because, under section 31 (b) of the 1917 act, while profits accumulated prior to March 1, 1913, could still be distributed tax free, that tax-free distribution could be availed of only after distribution of earnings and profits accrued since March 1, 1913, had been made. It was in regard to this feature that the Senate committee on October 2, 1917, said in its report submitted to the Senate after conference with the House of Representatives:

"In order to be just to the corporations and at the same time to encourage them to distribute their annual earnings, your committee reported to the Senate and the Senate adopted an amendment providing that the surplus when distributed shall be taxed to the distributee at the rate prescribed by law for the year in which they were earned, but also provided that any distributions of surplus made in 1917 or subsequent tax years should be deemed to have been made from the most recently accumulated undivided profits, thereby making it necessary for the corporation to distribute its surplus earned since March 1, 1913, before that earned prior to that time." Cong. Rec. p. 8690.

There is no suggestion in this report that "most recently accumulated surplus or undivided profits" was intended to refer to 1917. On the contrary, the observation as to encouraging corporations to distribute "their annual earnings" indicated a clear understanding that accumulated "undivided profits or surplus" are ascertained upon some annual basis, and the committee was distinguishing between surplus accumulated before March 1, 1913, and surplus accumulated after that date. The legislation as originally passed by the Senate read:

"Provided further, that any distribution made to the shareholders of a corporation, joint-stock company or association, or insurance company, in the year nineteen hundred and seventeen, or subsequent tax years, shall be deemed to have been made *from the net income of the years in which such distribution is made or, if such income is insufficient*, from the most recently accumulated undivided profits or surplus, and shall constitute a part of the annual income of the shareholder of the respective years in which earned by the corporation, joint-stock company, or association, or insurance company, and shall be taxed to the shareholder at the rate prescribed by law for such year."

This had been preceded by the report made by Senator Simmons, chairman of the Senate finance committee, wherein it was stated, inter alia:

"Ninth. That dividends declared and paid in the year 1917, or subsequent tax years, shall be deemed to have been paid from the *net income of the year in which paid, or from the most recently accumulated surplus*, and shall constitute a part of the annual income of the shareholder for the years in which earned by the concern, and the tax to be paid by the shareholder thereon shall be at the rate prescribed by law for such years." Report No. 103, 65th Congress, 1st Session, Calendar, No. 106, p. 21.

While the Senate finance committee and the Senate intended that dividends declared in 1917 should be deemed to have been paid first from

such net income as might be earned in 1917, it is plain that this program was not satisfactory to the conference committee. The result was that the part of the bill italicized supra, as passed by the Senate, was stricken out, and 31 (b) was enacted in its present form.

It is argued by defendant that the reason for this elision was that the technical meaning of "net income," under an income tax statute, is by no means synonymous with net earnings, because a taxpayer is allowed certain exemptions and the like before his net income can be ascertained. We think this argument is not convincing; for before the net income of a year can be determined the net earnings must first be ascertained. The real point of this legislative history is that the Legislature was not, in this regard, dealing with current earnings and, by the most obvious procedure, had eliminated current earnings from consideration as affecting the rate at which the taxpayer was to be taxed.

Of all the other contentions we notice but one. The illustration is suggested of a corporation which had no surplus on December 31, 1916, or prior thereto, and which made earnings, large or small, during the year 1917, and the question is asked whether such earnings would go tax free. Experience demonstrates that, however carefully framed, a tax statute rarely, if ever, can be drawn with such extraordinary foresight that it will provide for every possibility. Two answers may be suggested to the inquiry: First, if the 1917 statute had continued on the books, any undivided profits or surplus accumulated in 1917 could have been reached in 1918; second, just as shareholders of those corporations which made a distribution prior to August 6, 1917, were in some respects preferentially treated, so it might be well contended that the shareholders in those corporations which might distribute subsequent to August 6, 1917, out of undivided profits or surplus accumulated prior to 1917 were to be preferentially treated over those who received dividends out of profits made solely in 1917. There is support for the latter view in conditions that were then and are now well known. The war appreciated the value of certain classes of business and destroyed or impaired the value of others. New business enterprises were started to manufacture and sell munitions and other products, to which the war had given unprecedented values. It was but right that those who benefited should make substantial contributions to the government. Upon the other hand, many corporations, at the close of 1916, had on hand accumulated surplus or undivided profits which had not been distributed. The shareholders of such corporations had, in effect, no power to compel distribution; for, in the absence of fraud, declaration of dividends and the distribution of accumulated surplus and profits rested in the discretion of the directors of the corporations.

It may well be concluded, as indicated by the report of the Senate committee, after conference, that it was regarded as fair that the shareholder, who had invested his money in a corporation which on December 31, 1916, or prior thereto, had accumulated undivided profits or surplus undistributed, should not be asked to pay the high 1917 rate, if dividends could be distributed out of previously accumulated undivided profits or surplus. But, if any or all these suggestions are without merit, it is nevertheless clear, as matter of statutory construc-

tion, that it was not intended, on facts such as those in the case at bar, that the shareholder should be taxed at the 1917 rate, even though, because of the amount involved, "it requires a struggle to resist the influence of the fact," as was tersely said by Mr. Justice McKenna, in Lynch v. Turrish, supra.

[12] We have not overlooked the treasury regulation (article 107 of Regulations 33, Revised), which interpreted the statute substantially as defendant contends. We are also mindful of the rule that the regulations and practices of administrative departments are entitled to weight and serious consideration in construing a statute; but opposed to this rule is the familiar one that it is for the courts to construe a statute, and not the executive departments of the government, and where, as here, we are satisfied that the statute requires the construction which we have attributed to it, a treasury regulation rises to no higher dignity than an expression of opinion.

We have also not overlooked the fact that Douglas paid at the 1917 rates on the so-called regular dividends; but, as this payment was not in issue in this litigation, we express no opinion as to what might be the correct rule, if Douglas had insisted that his so-called regular dividends were not subject to the 1917 rate.

We have also noted the observation passim of counsel for defendant that the complaint stresses the proposition that the so-called depletion dividends were capital, and not income, and that it is not, in so many words, alleged that Douglas is not subject to the 1917 rate. We think, however, that the language, both of the protest and of the complaint, is sufficiently broad to put the question in issue, and the record clearly indicates that the parties litigated this question as well as the capital income question, and so desired and understood.

In view of our conclusion that the so-called depletion dividends were taxable, there was on hand on December 31, 1916, a sum amply sufficient to enable Phelps Co. to pay these dividends out of the accumulated surplus or undivided profits as of December 31, 1916, and these dividends distributed to and received by Douglas should have been taxed at the rate prevailing in 1916. Under Slocum v. New York Life Insurance Co., 228 U. S. 364, 33 Sup. Ct. 528, 57 L. Ed. 879, Ann. Cas. 1914D, 1029, we must reverse the judgment below; but the District Court is directed on a new trial to enter judgment in accordance with this opinion.

Judgment reversed.