CHATTANOOGA SAV. BANK v. BREWER, Collector of Internal Revenue.

(District Court, E. D. Tennessee, S. D. August 26, 1925.)

**1. Internal revenue ⬳7—Distribution need not be called a "dividend" for purpose of income tax.**

To be a "dividend," for purpose of income tax, a distribution by a corporation need not be called a dividend, and there need not be any formal declaration.

**2. Internal revenue ⬳25—Income tax assessed on basis of actual facts, irrespective of corporation's books.**

Government is not precluded from going behind corporation's books, and assessing income tax on basis of actual facts.

**3. Internal revenue ⬳7—Withdrawal of surplus net profits by officer held not "loan," but to be taxable as "dividend" during 1920.**

Withdrawal of surplus net profits of corporation by officer, who was in complete control and management, held not a "loan," notwithstanding it was not authorized by board of directors until following year, and hence withdrawal was conclusively presumed taxable for year of withdrawal in view of Revenue Act 1918, § 201 (a), being Comp. St. Ann. Supp. 1919, § 6336⅛b, defining a "dividend," and policy of Congress not to allow taxpayers to determine for themselves to what year a distribution shall be allocated, and it being immaterial that such withdrawal was unauthorized and that it depleted capital stock of corporation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Dividend.]

**4. Estoppel ⬳98(3)—Withdrawal by decedent of surplus net profits of corporation no ground for complaint by administrator, seeking to recover income tax levied thereon.**

If deceased corporation officer, in withdrawing surplus net profits of corporation without resolution of board of directors, violated law or by-laws of corporation, it was not a matter of which his administrator, seeking to recover income tax paid on such withdrawal, could complain.

**5. Corporations ⬳152—Withdrawal of surplus net profits by corporate officer held not unlawful.**

Withdrawal of surplus net profits of corporation without resolution of board of directors, by officer who, with another, were real owners of all stock, held not unlawful.

In Equity. Bill by the Chattanooga Savings Bank, administrator of the estate of John D. Key, deceased, against L. P. Brewer, Collector of Internal Revenue. Bill dismissed.

Charles S. Coffey, of Chattanooga, Tenn., for plaintiff.

Geo. C. Taylor, of Knoxville, Tenn., for defendant.

HICKS, District Judge. This is an action brought by plaintiff, Chattanooga Savings Bank, as administrator of the estate of John D. Key, deceased, to recover the sum of $13,555.89, which it alleges was illegally exacted from it by the defendant as collector of internal revenue. Upon the hearing the plaintiff requested a written finding of facts, to which request I respond as follows:

Finding of Facts.

The Key-James Brick Company, a Tennessee corporation, was organized about the year 1912. Its history up to 1919 is not material to any issue here. During the year 1920 its directors were John D. Key, Webster T. James, C. E. James, D. M. Hey, and A. B. Adams. C. E. James, D. M. Hey, and A. B. Adams were dummy or paper directors, required by corporation laws of Tennessee.

They took no active management in the corporation. The record indicates that Hey was never at the plant at all. W. T. James was about the plant occasionally, but he took no active management in its affairs, although he was vice president in the year 1920, and seems to have drawn a salary. John D. Key was in active charge. He was the president and general manager and active treasurer of the corporation. A. B. Adams was secretary and bookkeeper, acting solely under the direction of Key. The authorized capital of the company was $100,000, of which $69,000 was outstanding, leaving $31,000 unissued. Mr. Key owned $\frac{52}{69}$ and Mr. W. T. James $\frac{17}{69}$ of this $69,000 outstanding stock. Qualifying shares had been issued to the paper directors, which were in turn assigned to Mr. Key and Mr. James.

At the close of business December 31, 1919, the company had a surplus of $27,198.73. On January 15, 1920, the following entry appears upon the minutes of the directors' meeting of that date, to wit: "Thereupon it was moved by A. B. Adams and seconded by W. T. James that $27,000 of said surplus be distributed to stockholders in pro rata of their share holdings, and motion was adopted. Said distribution was thereupon ordered to be made upon the following basis: John D. Key, $\frac{52}{69}$ of $27,000, $20,347.83; W. T. James, $\frac{17}{69}$ of $27,000, $6,652.17; and the secretary was directed to credit their respective accounts accordingly."

As reflected by the auditor's report at the close of business December 31, 1919, James was charged with $4,000 and Key with $2,500. This $4,000 for the most part represented advancements made to James during the year 1919, and was discharged on January 15, 1920, by deducting it from his dividend of $6,652.17, and James was given a check for the remainder. The same thing occurred as to $2,500 charged against Key. At the close of the year 1920, the company had a surplus of net profits to the amount of $100,438.79. Out of this amount from time to time, and at various times during the year 1920, Key had received $53,368.80, and James had received $17,444.72. The amount each received was practically in proportion to the amount of the capital stock owned by each. The payment of these amounts in the manner and at the times indicated was not authorized at any meeting of the board of directors, or at any stockholders' meeting. As a matter of fact there was only one meeting of either in the year 1920, to wit, the before-mentioned meeting of the board of directors on January 15, 1920, and a meeting of the stockholders of the same date.

The manner in which these various amounts were received by Mr. Key and Mr. James is reflected in the testimony of Mr. Adams, as follows: That he was secretary of the company in 1920, and had charge of the books, and that personal accounts were carried on the ledger against Key and James. The debit and credit side of these accounts for 1920 are copied in the testimony written up by the stenographer at pages 47 and 48. In his capacity as bookkeeper Adams submitted statements at frequent intervals to Mr. Key, showing the condition of the company's finances and cash on hand, and from time to time Key would tell him he wanted a check, and that Mr. James wanted a check, as advancements, wanted to borrow some money, and that on Key's instructions he (Adams) would draw the check; that he had no authority otherwise; that he was never consulted by Key as an officer or director of the company with reference to whether such withdrawals should be made; that he, as bookkeeper, knew what money was taken in and was paid, and that no moneys were paid to Mr. Key or Mr. James without his knowledge; that he wrote the checks; that the checks were signed by Mr. Key in his capacity as president and treasurer, but that he (Adams) as bookkeeper drew the checks and made the entries on the books in the usual run of bookkeeping; that it was his manner as bookkeeper of keeping memoranda of the transactions; that the accounts receivable upon the books were divided into trade accounts receivable, suspense accounts receivable, and personal accounts receivable.

"Q. You say there were no dividends as such authorized, except those authorized by the board of directors, or authorized in the year 1920 after the January, 1920, authorization; was that the statement you made? A. That no dividends were authorized, except such as authorized by the board of directors.

"Q. You mean by that nothing more than this: That there wasn't any meeting of the board of directors that formally directed the payment of the several advances to John Key and W. T. James, when these several advances were made during the year 1920? A. There was no meeting of the board of directors that ordered those advances.

"Q. And that is all that you mean by that statement—that no dividends were issued, except by vote of the board. You mean by that to deny that any meeting of the directors was

held to authorize the payment of those men of those various payments they received during the year 1920? A. No meeting of the directors was held.

"Q. That is all you mean to say by that statement, isn't it? A. That is all I can say.

"Q. You say you were not consulted about any of these advances. Of course, you knew about all of the advances made? A. Yes.

"Q. But you mean by that that Mr. Key never said to you, 'Mr. Adams, may I pay myself $7,500 this month? He never asked your permission to do it? A. No, sir.

"Q. And you didn't make any remonstrance about his taking $7,500, and at the same time advancing to Mr. James here his $2,500, at any time, did you? A. No, sir.

"Q. Never made any objection to it whatever? A. No, sir.

"Q. Simply took it and put it on a personal memorandum as to the dealings of those particular stockholders with the company which they owned? A. Charged it to each through the ledger in the personal accounts.

"Q. You put it on what you call the personal account in the ledger in the same way that you charged to them in the ledger their salaries which they earned from month to month? A. Right on the same page.

"Q. And while salaries was their money, and they earned it, and they took it, this money was something advanced to them, and you put it on precisely the same account as Mr. Key's $800 or $1,000, or whatever he was drawing a month for his pay as president? A. Until the close of June, 1920, when our system was changed by a firm of Chicago auditors, and salaries accounts were carried separately. * * *

"Q. What did you do with the advances? A. Charged them to them.

"Q. In the personal account? A. As accounts receivable, shown by the ledger.

"Q. In the personal account? A. What do you mean by personal account?

"Q. Where you kept the salaries? A. No, sir.

"Q. Took them out of the salaries? A. Yes. * * *

"Q. So when it comes down to the last analysis, this matter of shifting those accounts from one place to another is largely, so far as you are concerned, just a matter of bookkeeping? A. Yes.

"Q. It is your method of keeping track of the transactions that these friends had in the business which they owned together? A. Yes.

"Q. That is exactly what you mean by it, and that is all, isn't it? A. Yes. * * *

"Q. How often did you make a statement to Mr. Key of the state of the accounts and books? A. Every month.

"Q. Did you at that time give that same memoranda to Mr. James? A. Yes.

"Q. The other stockholder? A. Yes.

"Q. So that each month those people knew just what was going on, and did those memoranda that you had show anything about the withdrawals of money? A. They reflected the true condition of the business.

"Q. It shows your bank account, of course? A. Yes.

"Q. And what money had been withdrawn by Mr. James? A. Yes.

"Q. So that each month those people knew exactly what they had been doing? A. They knew what I had been doing."

Mr. Adams further testifies that neither Mr. Hey nor Mr. James, Sr., the other two directors, ever found any fault with the way in which the accounts were being handled, nor was any question raised about it, until the directors' meeting in January, 1920; that he had not sent statements to either Mr. C. E. James or Mr. Hey, and that no information with reference to the withdrawals was sent to them from the office; that, in making the entries on the books of the checks and withdrawals, he was simply acting as bookkeeper, and that he was not thereby making a record of action by the board of directors, and that in issuing the checks to Key and James he simply followed Key's instructions; that he never had any conversation with Mr. Key about it; that he did not regard the surplus or assets of the corporation in any way distributed by these transactions, because he considered the accounts against Key and James as solvent; that he regarded these transactions essentially as loans to Key and James, and he regarded the entries on the books as open accounts, and as evidence of loans from the corporation to Key and James, but that no note or other evidence of indebtedness was given therefor.

"Q. You had nothing but your book accounts where you had advanced to them, and then in this memorandum or account you considered that you had loaned it, and there was the evidence of the loan? A. There was evidence of the debt to the company."

Mr. W. T. James also testified as follows with reference thereto:

"Q. Had it been customary, Mr. James, prior to the year 1920, for you and Mr. Key to have charges made to you on the books

of the corporation, either of withdrawals or for other purposes? A. It had been.

"Q. Can you state the nature of any of those charges? A. Well, some of those charges on the books were made against me for coal that I used in my house that I bought through the plant, and some of them were charges on advancements that the company made to me, charged against my account. * * *

"Q. Do you recall withdrawals, cash, made by you as a stockholder during the year 1920 from time to time? A. Yes.

"Q. Will you please state the circumstances under which such withdrawals were made? A. Well, in case that I would want any funds, I would ask Key if the brickyard could advance me a certain amount of money, and he would say he would find out. A few days after that he would give me a check, possibly for the amount I would ask for, or possibly not as much, and be charged up against my account.

"Q. How many times did that occur? A. I don't recall exactly in that year, but something, I think, four or five times. It is on the books there and shows.

"Q. Where would you generally see Mr. Key with reference to whether the company would let you have such funds? A. I would meet him mostly at the club at lunch.

"Q. Have you stated in substance the conversations you would have with him on such occasions? A. The only conversations I had with him on any occasion, I would tell him I wanted certain funds, and if the brickyard could advance that much; he would say he would look up and see, and he would give me a day or two after that a check for maybe that amount, or maybe not the amount I ask for.

"Q. On any of those occasions was there a meeting by you and Mr. Key as stockholders at the offices of the corporation or at any other fixed point? A. No; we had no meetings.

"Q. Would any notice be sent out of such a meeting? A. You mean between he and myself?

"Q. Would any notice be sent to bring you two together? A. No, sir.

"Q. Was anything said in any of those conversations, or on any occasion, with reference to dividing profits and earnings of the corporation? A. No, sir.

"Q. Was anything said on any of those occasions with reference to Mr. Key withdrawing for himself any amounts from the funds of the corporation? A. No, sir.

"Q. Did you know, at the time that he brought the checks to you and gave them to you for your advancement, that he had taken any amount for himself? A. No; I knew nothing about what he took, except from the monthly statements I would get.

"Q. Would you see that his personal account reflected charges to him? A. Yes.

"Q. On any one of these occasions when withdrawals were made, were you aware that he had taken any amount out until you saw the statement of the succeeding month? A. No; I had no way to know. * * *

"Q. Did you ever discuss the matter of any funds with your father, C. E. James, during the year 1920? A. No.

"Q. To your knowledge, did he know of these withdrawals? A. I don't think he did.

"Q. Did you ever discuss them in any way with D. M. Hey? A. No, sir; I did not.

"Q. To your knowledge, did he know anything of the withdrawals? A. I don't think he knew anything about it. * * *

"Q. Mr. James, were you aware that, when these checks were brought to you by Mr. Key for the advancement or withdrawals during 1920, here in question, they were charged to your account on the books of the corporation? A. Yes; charged against me.

"Q. Did you recognize that as a debt due the corporation by you? A. I did.

"Q. You and Mr. Key organized this corporation back in 1912? A. Yes.

"Q. You were personal friends, I apprehend? A. Yes.

"Q. And continued friends throughout his life? A. Yes.

"Q. And you regard him as a friend who has gone now; no animosity or ill feeling on your part for anything he did, is there? A. No, sir.

"Q. Mr. Key was conducting this large, growing business to your satisfaction, was he not? A. Yes.

"Q. You had perfect confidence in Mr. Key and his way of doing things, I am sure? A. I was satisfied.

"Q. Perfectly satisfied? A. Yes.

"Q. And were willing to intrust your interests, which were considerable, to his management in connection with that business, weren't you? A. Yes. * * *

"Q. You knew perfectly well that Mr. Key was drawing from that account, didn't you? A. I only knew that he was drawing when I saw those reports.

"Q. But he might draw, and then you would see that he had drawn when you got the next monthly statement? A. Yes.

"Q. It was in your mind, of course, as a man acquainted with the business, that your

associate, Mr. Key, was drawing money from that account that you had accumulated there, in your account from time to time, just as you were, wasn't he? A. Yes.

"Q. And you made no objection to it of any kind? A. No, sir.

"Q. Never found any fault for that, and never found any fault with him for what he advanced? A. No, sir.

"Q. Did he ever say to you, 'Mr. James,' or whatever name he called you by, as you met at the club, 'we have quite a little balance; don't you need some money.' Are you sure he didn't say anything of the kind? A. I don't remember that.

"Q. If anybody told you that he had, would you be willing to dispute it? * * * A. I have no recollection of John ever asking if I wanted any money. I was always the one asking him. * * *

"Q. In other words, you felt that this was a corporation that you and John Key owned together; you were the corporation? A. Well, we owned the stock.

"Q. Well, you owned everything there that was behind the stock. Your father didn't own any of it, did he? A. No, sir.

"Q. He was what we would call a paper director up in my country; you call it a dummy director? A. That is what he was.

"Q. A man with no pecuniary interest in the corporation, but holding only one share to qualify as a director in the corporation? A. Yes.

"Q. And these other men, as to whom you have been inquired about, they also were paper directors in the company; Mr. Hey and Mr. Adams was really a paper director? A. That was entirely different.

"Q. But as far as stockholdings are concerned, he didn't own any more than Hey? A. No, sir.

"Q. And you didn't consider that you had to have Adams' permission, or Hey's permission, or your father's permission, to do anything that you and John Key did among yourselves; full owners of the company, that you wanted to do? A. No, sir; we couldn't do anything, except by the directors authorizing it.

"Q. Well, you did? A. No, sir.

"Q. Well, you took money? A. We took advances.

"Q. But the directors never authorized the advances? A. No, sir.

"Q. But you took them as owners? A. Yes.

"Q. And used the money for your own purposes? A. Yes.

"Q. Having nothing whatever to do with the corporation? A. Yes.

'Q. And you never got the money any time whatever during 1920, you never got a penny when they declared dividends in 1921, amounting to $17,444 and some cents in 1921, because you had it; that is true? A. No.; didn't get any. * * * As stated before, when I needed funds, I asked Key if he could advance me any certain amount. It was entirely up to him whether he could do it or not.

"Q. Of course, if the company couldn't part with it, you didn't want it? A. No, sir. * * *

"Q. You, in the year 1919, had applied for money from time to time on one or two instances; at any rate, in just the same way? A. Yes; much in the same way.

"Q. And then, when dividends were made later on, it simply canceled your indebtedness, and perhaps gave you something more, or perhaps an overdraft? A. Generally got a check.

"Q. Generally got a check for the difference? A. Generally got a check for the additional.

"Q. You said, if I understood you correctly, that you recognized these advances as something that you owed the corporation, in case the corporation needed it? A. Yes.

"Q. In other words, if you had drawn too much money out of the till, and had to put some back, so that some obligation could be met, you stood ready to do it, and stood behind Mr. Key? A. I was ready to put back what was charged against my account.

"Q. Anything taken from the account, if it oughn't to have come out, you were perfectly willing to put it back? A. Yes.

"Q. And no doubt he was, so far as you know? A. So far as I know; yes. * * *

"Q. Mr. James, you got a check in 1920, along about November 9th, that was something over a month prior to the death of Mr. Key. He died January 1st, didn't he? A. Yes.

"Q. November 9th is when you got your big check there, that $17,444, wasn't it? A. About $7,400 and something, I think it was.

"Q. That is right. You had drawn something before that? A. Yes.

"Q. And you got that amount? A. Yes.

'Q. Was that amount asked for by you? A. Not that amount. I asked him if he could give me a check, and he told me that he would see what he could do, and in two or three days at the club he handed me a check; I didn't know the amount of it, and went to the office and opened it up.

"Q. Did you make any inquiry as to why it was that amount? A. No, sir.

"Q. You didn't know that, when he drew this, he drew enough to bring up his? A. No; I didn't know that he had drawn at all at that time."

As portrayed by the entries taken from the books on January 15, 1920, Key was charged with $3,326.08, and on the same date with $14,521.75, making total cash received by him on that date of $17,857.83. On the same date James was charged with $2,652.17. On April 1, 1920, Key was charged with $15,072.46, and Adams was charged with $4,927.54. On July 28, 1920, Mr. Key was charged with $7,500, and Mr. James with $2,500. On November 9, 1920, Key was charged with $22,982.82, and James with $7,017.18. These figures do not indicate all the charges upon the books against either, but I am simply using them as illustrating the evident fact that both were withdrawing cash on the same dates and each in proportion to his shareholdings.

The insistence of the defendant is that this $53,360.80 received by Key from the Key-James Brick Company, in varying amounts and at different times in the year 1920, is taxable income for 1920. The insistence of the plaintiff is that this fund does not represent income at all for the year 1920, but is taxable as income for the year 1921. This insistence is based upon the idea that the receipts of this fund by Key in 1920 was only a loan to him by the company, for which loan he was charged upon the books of the company, and that it could not be taxable as income until July 14, 1921, when the following resolution was passed by the board of directors, to wit:

"It was moved by Mr. W. A. Sadd and seconded by Mr. W. T. James that the amounts listed in said report as accounts receivable due from W. T. James in the sum of $17,444.82, and due from the estate of John D. Key, deceased, in the sum of $53,360.89, be written off as a dividend. Said motion carried. It was then regularly moved and seconded that the sum of $70,805.52 be withdrawn from the surplus account and distributed to the stockholders in proportion to their shareholdings, and said motion carried. Said distribution was thereupon ordered to be made as follows: W. T. James, $^{17}/_{69}$, or $17,444.72; estate of John D. Key, deceased, $^{53}/_{69}$, or $53,360.80, and the secretary was instructed to credit their respective accounts accordingly."

I conclude, from the testimony quoted above, as well as from all the other facts and circumstances adduced in evidence in the case, and therefore so find as a fact, that this sum of $53,360.80 was not a loan to Key, and was not so regarded. In determining this question, one must look, not alone to book entries made by the bookkeeper, or to isolated expressions of witnesses or parties, but one must endeavor to visualize the entire situation as it existed. With the exception of a few occasional conferences with James, which seem to have been of slight importance, Key was as completely and unrestrictedly in control and management of the company as if it had been his individual business. While Adams was in law a director, he was in fact the agent and employee of Key, and was directed by him. The checks for this money were given to Key at his instance only. If these transactions constitute a loan or loans, then as a matter of fact the loan was made by Key to himself, which is, of course, an unthinkable thing, for a borrower necessarily implies a lender. The charter of the company forbids any loan to a stockholder, and it will hardly be presumed that Key, who was not only a stockholder, but president and manager, would openly and directly violate this provision of the charter.

Whatever may be said as to the legal ownership of this fund being in the corporation, yet it remains that in point of fact and of strict right it belonged to Key. He and James were the sole stockholders. No other person had any real equitable interest therein. The money was accumulating, it was idle in the treasury, and James would occasionally ask that certain amounts of it be advanced to him. I think there appeared to Mr. Key no good reason why this should not be done, and that he therefore at intervals made a division of it between himself and James, its real owners, in accordance with the shares of each therein, and I assume that the entries upon the books constituted in fact nothing more than a memorandum, indicating the amounts each had received, rather than any obligation upon the part of either to repay. Neither ever gave any note or other evidence of indebtedness nor were they ever charged, nor did they ever pay, interest thereon. If the facts justify the conclusion that this was not a loan to Key, then it follows that it was taxable income for 1920.

The term "gross income" is defined by the law to include "gains, profits, and income derived from * * * dividends * * * or transaction of any business carried on for gains or profits and income

derived from any source whatever." The Revenue Act of 1918 defines dividends as follows:

"Sec. 201. (a) That the term 'dividend,' when used in this title, * * * means (1) any distribution made by a corporation, * * * to its shareholders or members, whether in cash or in other property or in stock of the corporation, out of its earnings or profits accumulated since February 28, 1913." Comp. St. Ann. Supp. 1919; § 6336⅛b.

[1] In order to be dividend for the purposes of the income tax, a distribution need not be called a "dividend." There need be no formal declaration. Holmes' Federal Taxes, p. 774, § 407. This fund constituted a portion of the earnings or profits of the Key-James Brick Company for the year 1920, and was as a matter of fact distributed to its two shareholders in that year.

I cannot concur in the proposition, so plausibly advanced by able counsel, that the resolution of the board of directors of July 14, 1921, declaring a dividend and ordering a distribution, ipso facto impressed this fund with the characteristics of income for 1921. At the date of this resolution directing that "the sum of $70,805.52 be withdrawn from the surplus account and distributed to the stockholders in proportion to their shareholding," and the further direction that distribution be made to James and Key, the corporation did not have the money to withdraw or distribute. The money had the year before been withdrawn and distributed by Mr. Key.

[2, 3] Real facts, rather than record resolutions, give rise to income. Resolutions of directors, after all, are no more than evidential. Doyle v. Mitchell, 247 U. S. 179, 38 S. Ct. 467, 62 L. Ed. 1054 (T. D. 2723); Southern Pac. R. Co. v. Muenter, 260 F. 837, 171 C. C. A. 563 (T. D. 2944); Douglas v. Edwards (C. C. A.) 298 F. 229. In other words, the government is not precluded from going behind the corporation's books and assessing the tax upon the basis of actual facts. If the distribution of the money by Mr. Key in 1920 was a distribution at all, as distinguished from a loan, then it by the very terms of the act of 1918 —section 201, subsec. (a)—was conclusively presumed to be taxable for 1920, and this because it was not the policy of Congress, as pointed out in the cases of Harder v. Irwin (D. C.) 285 F. 402 (T. D. 3420), and Douglas v. Edwards (C. C. A.) 298 F. 237, to allow taxpayers by means of bookkeeping or otherwise to determine for themselves to what year such distribution should be allocated.

[4, 5] The plaintiff advances two other propositions: First, to wit, that the action of Key in withdrawing this money was without authority; and, second, that its withdrawal depleted or impaired the capital stock. I think the second proposition would only be material in case it should clearly appear that the fund withdrawn was a part of the capital stock, in which event it would not be taxable as income. But this does not clearly so appear, and as I view the record it is not so insisted; the testing question being not whether the amount involved is a part of the capital stock or income, but simply whether it as income should be reported and taxed in 1920 or 1921. I do not think either proposition affects the position of the plaintiff. It is true that under the by-laws (article 5, § 1): "Dividends shall be declared only from the surplus profits of the company at such times as the board of directors shall direct, and no dividend shall be declared that will impair the capital of the company." If Key violated the law and by-laws in either of these particulars, it might be a matter of which the corporation itself or a creditor thereof could be heard to complain in a proper case; but I apprehend that the plaintiff cannot be heard to make this objection in this case. Key died January 1, 1921. If he had lived, and had brought this action, he could not have been heard to say that, because in 1920 he distributed this income in violation of the by-laws, that he thereby gained an advantage by reason of his unlawful act, and certainly his administrator can stand upon no higher ground.

But, however the distribution of this fund by Key may be regarded in the light of the by-laws, yet as applicable to the substantive law of the land it can hardly be regarded as unlawful. He and Mr. James owned this fund; it in all equity belonged to them. No other director had any real interest in it, nor did any creditor. I assume that it is the law that, "where the officers of a corporation distribute the profits among the stockholders, without authorization by either the directors or stockholders, the corporation may be bound by the acquiescence of all the stockholders; and where the rights of third persons are not thereby impaired, the distribution of the profits of a corporation among its stockholders without any action on the part of the board of directors, but by the consent or agreement of all the stockholders, is the

equivalent of a dividend. Hence an agreement between all the stockholders as to the manner in which the profits of the corporation shall be disposed of may be enforced, where the rights of creditors or of third persons dealing with the corporation are not thereby impaired." 14 Corpus Juris, p. 807, § 1227, and cases cited in footnotes; Spencer v. Lowe, 198 F. 963, 117 C. C. A. 497; Atherton v. Beaman (C. C. A.) 264 F. 881; Ratcliff v. Clendenin, 232 F. 66, 146 C. C. A. 253.

Entertaining these views, I think the bill should be dismissed; and it will be so ordered.

It remains, however, to pass formally upon plaintiff's request for findings of facts and conclusions of law, which I do as follows, to wit:

To plaintiff's request No. 1, I respond as follows: I do find that Key owned $52/69$ of the capital stock and was president and manager of the Key-James Brick Company, and that during the year 1920 he withdrew from the funds of the corporation various amounts, to wit, $53,360.80, which appear upon the books as a personal charge against him, but which were as a matter of fact simply memoranda of the amounts he had withdrawn.

In response to plaintiff's request No. 2, I find that James did own the remainder of the issued capital stock, and that he in 1920 likewise made withdrawals in the amount of $17,444.72, which appears upon the books as charged to him, but which as a matter of fact were simply memoranda evidencing the amounts withdrawn. I find that the amounts withdrawn both by Key and James were distributions from income rather than loans.

In response to plaintiff's request No. 3, I find that on July 14, 1921, the directors passed a formal resolution as indicated in this request, but that such formal resolution did not as a matter of fact declare a dividend or pay same, by causing it to be credited on the personal accounts of the stockholders and offsetting it against the overdrafts, because as a matter of fact the distribution of the income had already in the year 1920 been made by Mr. Key, and this fund was therefore not available on July 14, 1921, as a dividend or for distribution.

In response to plaintiff's request No. 4, I do so find.

In response to plaintiff's request No. 5, I do so find.

In response to plaintiff's request No. 6, I do so find.

In response to plaintiff's request No. 7, I do so find.

In response to plaintiff's request No. 8, I do not so find.

The circumstances indicate to me, and I find, that while James did not know, at the time he got each individual check, that Key had withdrawn a proportionate amount for himself, yet from the statements James was receiving from time to time from the bookkeeper he did know that Key was making these withdrawals ratably, and that it was tacitly agreed and understood that each party was thus receiving from the surplus and income of the company his proportionate share thereof.

In response to plaintiff's request No. 9, I do so find. As hereinbefore indicated, however, I do not regard such finding as material under the facts of this case.

In response to plaintiff's request No. 10, I do not so find.

In response to plaintiff's request No. 11, I do not so find.

In response to plaintiff's request No. 12, it does appear that, if the income tax liability of the corporation, to wit, $42,320.32, was subtracted from the surplus, to wit, $100,430.39, that it would leave a remainder of $58,118.47, and that therefore, if a dividend of $70,805.52 should be declared, this would be $12,687.05 more than the amount available for dividends, and thus it might to this extent impair the capital; but I do not regard this as material or controlling to the issues presented, for the reasons hereinbefore indicated.

In response to plaintiff's request No. 13, I do so find.

In response to plaintiff's request for finding of law No. 1, I do not so find.

In response to plaintiff's request for finding of law No. 2, I do not so find.

In response to plaintiff's request No. 3 for finding of law, I do not so find.

The clerk will file this memorandum and these findings, and will likewise file the plaintiff's request for findings of facts and conclusions of law as of the date it was lodged with me, to wit, June 22, 1925.

An order will be agreed upon between counsel, dismissing the bill, in accordance with the rules.