### RHEINSTROM v. CONNER, Collector of Internal Revenue.

### FIRST NAT. BANK OF CINCINNATI v. SAME.

#### No. 5191, Civ. A. No. 85.

District Court, S. D. Ohio, Western Division.

June 29, 1940.

Jerome Goldman and Thomas C. Lavery, both of Cincinnati, Ohio, for plaintiff.

Calvin Crawford, U. S. Atty., of Dayton, Ohio, and Frederic W. Johnson, Asst. U. S. Atty., of Cincinnati, Ohio, for defendant.

DRUFFEL, District Judge.

The above entitled cases for refund of income taxes claimed erroneously assessed, were submitted for decision by the court upon the pleadings, agreed stipulation of facts and oral testimony, a jury being waived.

These cases grow out of the same set of facts and will be treated as one.

From a consideration of the evidence the court finds as a matter of fact: That the Karl Kiefer Machine Company, an Ohio corporation, was organized in the year 1908 with an authorized capital of $500,000, consisting of 3,000 shares of common stock, par value $100, 2,000 shares of preferred stock, par value $100; that 1500 shares of common stock and 420 shares of the preferred stock were fully paid up, issued and outstanding, the total paid-in capital being $192,000; that as of November 30, 1914, Karl Kiefer, now deceased, was the owner of 748 shares common stock and Minna W. Rheinstrom, now deceased, was the owner of 748 shares common stock, the remaining 4 shares of stock being in the names of others to quali-fy as directors, and on that day pursuant to notice, the directors authorized a reduction of the capital stock from $500,000 to $70,000 reducing the preferred stock to $42,000 (the amount previously issued) divided into 420 shares $100 par, and $28,000 common stock divided into 280 shares $100 par, and a certificate of reduction of capital stock was filed in the office of the Secretary of the State of Ohio to that effect; that each owner thereupon received new certificates for 138 shares of common stock in exchange for the original 748 shares. The reduction of the capital stock by the cancellation of the original common stock and the issuance of the new stock was reflected on the books of the company by reducing the value of the common stock account from $150,000 to $28,000 and transferring the $122,000 to the surplus and undivided profits account, which then was $31,006.80, making a total of $153,006.80; in 1921 the $122,000 was again transferred to a new account, "paid in capital", but no actual distribution of any kind was made, no physical segregation of assets, nor was any other action in regard to the capital stock reduction taken until 1934, when the company in addition to the payment of a dividend of $90,000, disbursed the $122,000 and cancelled the "paid in surplus" account, designating this payment as one which arose by the reduction of the common stock in 1914, the same being divided: $61,000 to Minna W. Rheinstrom and $61,000 to the beneficiaries under the will of Karl Kiefer, one-third, $20,333.33 to the First National Bank, plaintiff, as trustee; one-third to his widow, Adele W. Kiefer, and one-third to his brothers and sisters.

The earnings for the year 1934 were more than sufficient to pay the $90,000 dividend and the $122,000, the item in issue here.

Minna W. Rheinstrom died on October 1, 1937, and plaintiff, James A. Rheinstrom, her executor, thereafter paid under protest $24,528.39 additional income tax based on the receipt of the $61,000; plaintiff First National Bank, trustee, paid under protest, $1,310.95 additional tax based on receipt of the $20,333.33.

To explain the purpose of the company's reduction of the capital stock, the plaintiffs' proffered testimony: That prior to the time the stock was reduced in 1914 Karl Kiefer, who was then the head of the Karl Kiefer Machine Company and who

guided its policies, desired to make free for the stockholders a large portion of the then paid-in capital of the corporation, as the directors of the company considered the company at that time over-capitalized; that he desired to have available for the stockholders money which had previously been paid into the company in the form of the then existing paid-in capital, which could not be withdrawn from the company without impairing the capital without a reduction in stock, and it was determined to reduce the capital stock and thus create a fund which would be available to the stockholders at any time they wished to draw therefrom, and to make quick turns outside the business if they showed up, etc.

Although the evidence as to the company's purpose was rejected for various reasons, it may be well to consider the operations over the entire period in question, particularly in view of the fact that several exhibits were received in evidence bearing more or less on this phase of the case. Defendant's Exhibit H shows that the net earnings for the years 1910, 1911, 1912 and 1913 were $148,006.80 and dividends paid were $87,000. Considering that the company started with a paid-in capital of $192,000 in 1908 and had net earnings of $148,000 by the end of 1913, would seem to definitely dispose of the theory that the directors considered the company over-capitalized in 1914.

Plaintiffs contend that when the reduction of capital and cancellation of the 1220 shares of common stock was accomplished, a very real change took place in the stockholders' position with respect to the company in that Minna W. Rheinstrom's proportionate interest in the total ownership of the company was reduced from two-fifths to one-fifth, and that Karl Kiefer's interest was increased from three-fifths to four-fifths.

An analysis shows that this contention is without merit. When the company was organized Karl Kiefer owned all the preferred stock 420 shares and 748 shares common (one-half) Minna W. Rheinstrom 748 shares common (one-half). After the change Karl Kiefer still owned all the preferred stock 420 shares, and 138 common (one-half), and Minna W. Rheinstrom 138 common (one-half). There being no reduction in the assets of the company nor a distribution of any kind, the 138 shares of common actually represented the proportionate interest formerly represented by the 748 shares. In 1934, twenty years after the change or reorganization Minna W. Rheinstrom and the Karl Kiefer estate still owned the same proportion of the common stock of the company subject in 1934 as in 1914, to the 420 shares of preferred.

Plaintiffs further claim that since the payment of the $122,000 was in redemption and cancellation of the 1220 shares of the common stock, it was a partial liquidation within the meaning of Section 115(c) and (i) of the Revenue Act of 1934, 26 U.S.C.A.Int.Rev.Acts, pages 703, 704, and constituted a return of capital, and therefore is expressly exempted from the provisions of Section 115(b), and not taxable as income!

"Sec. [§] 115 * * * (c) *Distributions in Liquidation,*" provides:

" * * * and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. * * * In the case of amounts distributed * * * the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits within the meaning of subsection (b) of this section * * *."

"Sec. [§] 115 * * * (i) *Definition of Partial Liquidation.* As used in this section the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock."

"Not every redemption of its stock by a corporation is essentially equivalent to the distribution of a taxable dividend. Whether it is 'depends upon the circumstances of each case.' * * * Under the statute, consideration must be given to the time at which and the manner in which the redemption is made." Commissioner **v.** Champion, 6 Cir., 78 F.2d 513, 514.

"In its generally accepted meaning a dividend in liquidation means an act or an operation in winding up the affairs of a firm or corporation, a settling with its debtors and creditors, and an appropriation and distribution to its stockholders ratably of the amount of profit and loss," Hellman v. Helvering, 63 App.D.C. 18, 68 F.2d 763, 765; Northwest Bancorporation v. Commissioner, 8 Cir., 88 F.2d 293, 296.

In the case at bar beyond the reduction in the number of shares of common stock and the transfer of $122,000 to surplus at the expense of the common stock account, nothing was done even remotely suggesting partial liquidation. But on the contrary this $122,000 was retained in the business actively working for twenty years helping produce the splendid earnings and constant annual dividend record as shown by defendant's Exhibit H, until 1934, the earnings for that year alone being more than sufficient to pay $90,000 dividend plus the $122,000.

Plaintiffs finally contend as a matter of law that regardless of the express purpose, which they attempted to prove, the company was obligated to pay the stockholders the par value of the stock returned and cancelled; that the lapse of time between the cancellation and the payment made no difference, and that the payment in 1934 of $122,000 was in satisfaction of that obligation!

On analysis it appears that plaintiffs are again in error. When the capital stock was reduced from 1500 shares of common to 280 shares and the 1220 shares of common cancelled, this was reflected on the books of the company by merely reducing the common stock value account from $150,000 to $28,000 and increasing the surplus account by $122,000. There was no reduction or liquidation of assets or segregation of same, or distribution of any kind ordered or made. In the case of Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570, the Supreme Court speaks of the relations between the stockholders and the corporation. In that case the company increased its capital stock to permit the distribution of a stock dividend. In the instant case the procedure was reversed, but the language of the Court is equally applicable here. The court say, 252 U.S. at page 210, 40 S.Ct. at page 194, 64 L.Ed. 521, 9 A.L.R. 1570: "Thus the surplus may increase until it equals or even exceeds the par value of the outstanding capital stock. This may be adjusted upon the books in the mode adopted in the case at bar—by declaring a 'stock dividend.' This, however, is no more than a book adjustment, in essence not a dividend but rather the opposite; no part of the assets of the company is separated from the common fund, nothing distributed except paper certificates * * *. In order to make the adjustment, a charge is made against surplus account with corresponding credit to capital stock account, equal to the proposed 'dividend'; the new stock is issued against this and the certificates delivered to the existing stockholders in proportion to their previous holdings. This, however, is merely bookkeeping that does not affect the aggregate assets of the corporation or its outstanding liabilities; it affects only the form, not the essence, of the 'liability' acknowledged by the corporation to its own shareholders, and this through a readjustment of accounts on one side of the balance sheet only, increasing 'capital stock' at the expense of 'surplus'; it does not alter the pre-existing proportionate interest of any stockholder or increase the intrinsic value of his holding or of the aggregate holdings of the other stockholders as they stood before. The new certificates simply increase the number of the shares, with consequent dilution of the value of each share." and applying the language of the Supreme Court to the case at bar, the change was brought about through a readjustment of accounts—adding to surplus at the expense of common stock account, which did not alter the preexisting proportionate interest of any stockholder and the new certificates of common stock to Minna W. Rheinstrom and Karl Kiefer, merely decreased the number of shares, with consequent enhancement of the value of each share.

Defendant contends that regardless of the designation given the payment of the $122,000 by the plaintiffs it is controlled by the following sections and therefore taxable:

"Sec. [§] 115(a) *Definition of Dividend.* The term 'dividend' when used in this title * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits accumulated after February 28, 1913.

"(b) Source of distributions. For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. * * *"

In the case of Leland et al. v. Commissioner, 1 Cir., 50 F.2d 523, certiorari denied 284 U.S. 656, 52 S.Ct. 34, 76 L.Ed. 557, it was held: Section 115(b) "creates conclusive presumption that every distribution by corporation to stockholders is made from most recently accumulated earnings, where corporation has earnings accumu-

lated since February 28, 1913, and available for distribution," and since the net earnings of the Karl Kiefer Machine Company in 1934 were more than sufficient to pay the dividend of $90,000 and the item of $122,000 in issue, the court holds that the decision in the Leland case is controlling here, and concludes, as a matter of law, that plaintiffs have failed to sustain the burden of proof of their complaints, and that the payment of the $122,000 was a distribution within the provisions of Section 115(b) and therefore taxable.