**LEWIS v. O'MALLEY.**
No. 136.

District Court, D. Nebraska,
Lincoln Division.

Feb. 17, 1943.

174

William I. Aitken and Woods, Aitken & Aitken, all of Lincoln, Neb., for plaintiff.

Joseph T. Votava, U. S. Atty., of Omaha, Neb., and William B. Waldo, Sp. Asst. to the Atty. Gen., for defendant.

DELEHANT, District Judge.

Originally filed as Case No. 206 in the Omaha Division, this action was later transferred to this division of the court, and upon its complete trial is here for final disposition. The defendant is, and at all times involved, was Collector of Internal Revenue of the Omaha district and this suit was instituted against him as an individual, under 28 U.S.C.A. § 41, for the recovery of $13,690.56 with interest, alleged to have been collected illegally from the plaintiff as a deficiency in his income tax for the year 1936.

Essentially a single transaction, in two connected phases, is involved, and the question for determination is whether it resulted in the receipt during 1936 of taxable income by the plaintiff.

Stripped of its related and subsidiary facts, this is the transaction. The plaintiff, at the time in question was 51 years old, and a married man with several children, and the president and sole manager, and for the practical purposes of this case, the owner of all of the stock, of the Lincoln Hatchery, a Nebraska Corporation, operating a general poultry hatchery business in the city of Lincoln, hereinafter identified as the Hatchery. The exact details of stock ownership will presently be recited, but it may be noted here that the minor holdings of two inactive stockholders may, in the circumstances, be disregarded.

On May 9, 1936, the Hatchery being then in possession of a surplus arising from earnings and profits largely in excess of the disbursement now mentioned, with its check drawn and signed by the taxpayer in favor of Massachusetts Mutual Life Insurance Company for $25,000, paid the insurance company the full premium for a single premium ten-year endowment life insurance policy. In like manner on July 10, 1936, the Hatchery, still being in possession of an adequate surplus, paid the sum of $25,000.04 as the full premium for a single premium ordinary life plan insurance policy. Each policy was issued on the life of the plaintiff, solely upon his individual application, designated "The executors or administrators of the insured" as the beneficiary, and contained a clause granting to the plaintiff the right (subject to any previous assignment), to change the beneficiary. The second policy was issued under an amendment of the application of May 9, 1936, pursuant to an insurance selling usage, whereby, within a limited period after the initial application and medical examination, an additional insurance coverage may be obtained under the same application and examination. As of June 1, 1936, the plaintiff in writing requested the redesignation of beneficiary under the earlier policy in such fashion that in the event of the insured's death the proceeds should be paid, (a) contingent upon the survival during the installment periods of Norman R. Lewis, son of

the plaintiff, the sum of $5,000 to the said Norman R. Lewis in monthly installments of $100 and (b) any balance in one sum to the Christian and Missionary Alliance, an incorporated religious society, hereinafter called "The Alliance". The insurance company noted this change of beneficiary upon the face of the policy on June 8, 1936. By endorsement upon the later policy as of July 23, 1936, the designation of beneficiary was changed so that the entire proceeds of the policy as a death claim were made payable to "The Alliance". Eventually the beneficiary under each policy was redesignated as the executors or administrators of the insured, under the earlier policy on July 22, 1938, the later one on September 30, 1940, in each case immediately in advance of the surrender of the policy for its cash value. (vide infra). In form, both policies were individual life insurance policies. In neither of them was there a grant or reservation of any right or interest, either present or prospective, in favor of the Hatchery, which was an utter stranger to the terms of both policies.

In the face of the apparent individual character of the insurance policies, the plaintiff argues that certain facts show that the transaction was not personal to the plaintiff and resulted in no distribution to him out of the Hatchery's profits. Of these facts the following are admitted, or at least undisputed:

1. On July 9, 1931, the Hatchery, having a substantial then unused cash reserve, purchased from the same insurance company for $20,003.50 a single premium five-year endowment insurance policy upon the plaintiff's life in the sum of $22,120 in which the Hatchery was the sole beneficiary and reserved to itself every right and benefit under the policy, which was thus made a purely corporate transaction. It purchased the insurance as a method of preserving its available cash for recourse, through loan privileges or conversion option, during its seasonal peak financial demands, and, at the same time, obtaining at least a small measure of insurance protection and interest return. From time to time during the life of that policy the Hatchery borrowed different sums of money upon it which were utilized temporarily in its business. In these borrowings some annoyance and inconvenience, alike to the plaintiff and to the Lincoln representative of the insurance company,

arose out of the necessity of holding corporate board meetings of the Hatchery and obtaining certificates respecting its minutes and signatures of its officers to the instruments evidencing and securing the loans. On some occasions, in consequence of the delay involved in holding meetings and supplying copies of records, the Lincoln agent of the insurance company advanced to the Hatchery temporary loans out of his personal funds, and on one occasion, himself borrowed money from a bank to enable him to do it. That policy by its terms matured July 9, 1936.

2. Shortly in advance, and in view, of the maturity of the 1931 policy, the Lincoln, Nebraska, general agent for the insurance company discussed with the plaintiff the negotiation of a new policy but suggested to him the writing of individual insurance as a device for the obviation of the inconvenience that had been experienced in the course of borrowings upon the then current policy. It was out of this discussion that the issuance of the earlier of the 1936 policies immediately, and of the later one ultimately, arose.

3. After the issuance of the Hatchery's checks in 1936, each transaction was entered on the books of the Hatchery in precisely the same fashion in which the 1931 transaction had been entered; that is, against the disbursement of the premium checks, entries were made disclosing as an asset of the Hatchery the initial cash surrender value of the policies purchased, and as an insurance expense the difference between the premium checks and that cash surrender value.

4. In connection with the 1936 disbursements, no charges were made upon the Hatchery's books against the personal account of the plaintiff, reflecting either enlarged salary, a loan, a gift, or a distribution to him; no dividend was declared or other resolution for distribution adopted.

5. After the procurement of the 1936 policies, the plaintiff personally and the Hatchery, through the plaintiff as its president, made several financial statements to a bank all of which were consistent particularly in this, that the corporate statements showed the cash surrender values of the policies as corporate assets and the individual statements did not reveal the large insurance holding as the plaintiff's property. Likewise in income tax reports subsequently filed both

the Hatchery and the plaintiff consistently treated the cash surrender value of the insurance policies as an asset of the Hatchery.

6. From time to time after the issuance of the 1936 policies, loans were negotiated upon both of them in 1937, and upon the July, 1936, policy in 1940. The May, 1936, policy was converted into cash and surrendered in August, 1938, the July, 1936, policy in October, 1940. These loans were all negotiated and the policy surrenders made by the plaintiff individually; but in each instance cash payments made by the insurance company were made by its check to the plaintiff which he promptly endorsed and delivered to the Hatchery and the only loan repayment was made by a check from the Hatchery direct to the insurance company. All such borrowings were entered in the books of the Hatchery as loans upon the insurance policies. The repayment check was likewise entered there as were the receipts of cash on final surrender of the policies. In consequence of the loans upon, and surrender of, the policies, the plaintiff now has no property in or proceeds from the policies which have been extinguished; and the full cash surrender value of the policies has been returned to the Hatchery.

Pointing to a conclusion adverse to the plaintiff are the following manifest circumstances:

1. The form and contents of the policies themselves as instruments of a character purely personal to the plaintiff.

2. The plaintiff's exercise of his option to change beneficiary, under each policy, almost immediately after its issuance, and in the case of the earlier policy before the later one was issued, in such fashion that a disposition of proceeds as a death claim was provided in a manner intimately personal to the plaintiff and utterly unrelated to the Hatchery.

3. The plaintiff's complete domination through stock ownership of the Hatchery. Its corporate history need not be detailed too specifically. But it was organized by the plaintiff in 1922 as a device for the enlargement of a business theretofore operated by plaintiff individually. Though initially he had a number of stockholders associated with him, he was at all times in the sole actual management and control of the Hatchery. In 1936 its capital consisted of $15,000 in common stock, which had always been owned by the plaintiff, and $35,000 in preferred stock. Shares of both kinds of stock had a par value of $50 each. From time to time he acquired by purchase for varying prices the stock of other stockholders, being particularly active in that behalf early in 1936, with the consequence that when the earlier of the 1936 policies was purchased, he owned all but five shares of the preferred stock, and he was negotiating for the acquisition of these shares. He acquired four of them on May 17, 1936, from their owner, his former stenographer, and when the later of the policies was issued held all but a single share of the preferred stock owned by a nominal director which he acquired on January 25, 1937.

4. The utter failure of the corporate directors to take any action officially respecting the two disbursements, which, together involved the disposition of nearly one-half of the entire financial structure of the Hatchery. There are no minutes dealing with the transaction, and the only corporate entries at or near the critical dates are the corporation's checks signed by the plaintiff and the bookkeeping entries directed by him. It is noted, too, that before the acquisition of business insurance in 1931, there was a formal action of the board directing it.

5. The plaintiff's absolute and unrestricted corporate operation of the Hatchery. While he originally had the cooperation of a duly elected board of directors and officers, and initiated his corporation with the evident purpose of maintaining an accurate and orthodox corporate operation and history, he was always the dominant factor in the concern, and as he acquired the scattered outside stock in it he became progressively more indifferent towards the corporate entity and ultimately his management became complete and absolute. In fact, the minute books show no stockholders' meeting for 1935 and neither any stockholders' nor directors' meetings in 1936.

6. The plaintiff's uniform practice of paying his personal obligations out of the corporation's funds, even to the extent of utilizing such funds for the purchase of stock of other persons in the Hatchery. Such disbursements were by the Hatchery's bookkeeper charged against the plaintiff in a personal and family account book, the volume of which, from 1935 forward is an item of evidence. Incidentally, the check for $25,000 was entered as such a

charge when it was returned paid by the bank, but the entry was promptly thereafter deleted at the direction of the plaintiff. The $25,000.04 check was never so entered.

7. The minor circumstance that the first entries on the corporate books showing the asset of $47,000 as the total cash surrender values of the policies were somewhat tardily made being noted under date of August 26, 1936, more than three months after the date of the first policy.

8. The salary and dividend history of the Hatchery. The company, though prospering consistently has formally declared and paid only one dividend, and that in the autumn of 1926, concurrently with which it enlarged its outstanding preferred stock and the new offering was largely taken by the existing stockholders, with the result that, broadly speaking, the corporation never really declared and paid a dividend in the normal and usual fashion. However, as profits were realized the annual salary of the plaintiff was largely increased. For some years his salary was $3,500 per year, increased occasionally by a bonus as operating results justified. After 1929 he received $7,500 per year for some time. Then in 1936 he began to draw $12,000 per year (though at what time in the year does not appear, and his salary in his income tax return for that year is scheduled as $9,000), and even more recently has drawn as much as $30,000. For several years beginning before 1936 there has been no consistent record of directors' authorization of the salary of the plaintiff as president and manager.

9. Finally, the highly personal quality of the redesignation of beneficiaries under the policies and the haste with which this was accomplished, indicative of a purpose in that behalf at the time the insurance was secured. The significance of the dates of these changes is emphasized elsewhere. Their other circumstances are singular. The plaintiff was married and the father of several children. Prior to 1936, he had adhered sincerely and ardently (as he still does) to the Alliance as a religious society and participated actively in its spiritual program, even to the extent of visiting a part of its mission field in the continent of Africa. In 1936, too, he experienced some domestic discord which, if not connected with, was at least intensified by, some aspects of his relations to the Alliance. Contemporaneously,

he acquired all but five shares of the then outstanding stock of the Hatchery, completing that work less then two months before the earlier of the two insurance purchases. The designation of the Alliance as the beneficiary of much the greater part and, contingently, all of the death benefit provisions of the policies was not an accidental or isolated action. It was rather one step in the accomplishment of the plaintiff's purpose to divert the ultimate ownership of the entire hatchery business constituting nearly all of his property to the Alliance rather than to his family. Further pursuing that objective, the plaintiff, in the spring of 1937, made a gift of all of the stock of the Hatchery to himself as trustee for the Alliance and thereupon took the ordinary steps towards the transfer of the assets of the Hatchery to himself as trustee for the Alliance and the dissolution as a corporation of the Hatchery, planning thereafter to remain in the management of the Hatchery as an employee, but for the ultimate benefit of the Alliance. An action for divorce and a separate proceeding in equity to cancel the transfers to the Alliance as a fraudulent invasion of her rights were promptly brought by his wife. The latter proceeding resulted late in 1938 in a decree favorable to the wife, cancelling the transfer to the Alliance of stock and property of the Hatchery, and restoring title therein to the plaintiff in this case. And early in 1939 the previously attempted corporate dissolution was formally cancelled and the Hatchery restored to its corporate operation. A reconciliation resulted in the abandonment of the divorce case.

The foregoing are facts either admitted by the parties or found by the court clearly to exist. Other factual contentions and inferences, few in number, will presently be given consideration.

The court has concluded from its consideration of all the evidence and the pleadings that the transaction under scrutiny accomplished a distribution to the plaintiff from the Hatchery's earnings or profits which is taxable under the law.

The statutes involved are: (a) Title 26 U.S.C.A. Int.Rev.Code, § 22, whereby it is provided that " 'Gross income' includes gains, profits, and income derived from * * * dividends"; and (b) Revenue Act of 1936, c. 690, § 115, by subsection (a) of which it is provided that "The term

'dividend' when used in this title [chapter]" (with exceptions not presently relevant) "means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made"; and by subsection (b) of which, it is further declared, in part, that, "For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits." See 26 U.S.C.A. Int.Rev.Code, § 115(a) and (b).

Treasury Regulations 94 promulgated under the Act of 1936, serve merely to clarify these aspects of the Act.

Exceptions and reservations in the act and regulations need not be regarded, for it is unquestioned that throughout, and to the end of, 1936 the surplus of the corporation, organized after 1913, was adequate for the payment of a dividend in amount equalling the sum of the two premiums paid. That such payment might result in an imprudent depletion of its working capital and cash reserve, is instructive not upon the power to make the distribution and its taxability if made, but rather upon the actuality of a distribution, so far as that question is to be determined upon the basis of intent. Therefore, if a distribution was accomplished it resulted in the receipt of taxable income.

■■ Admittedly, the Sixteenth Amendment to the Constitution is a grant of power—so far as the present inquiry extends—for the taxation of income. And under it that may not be taxed as income, which is not income. Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570; M. E. Blatt Co. v. United States, 305 U.S. 267, 59 S.Ct. 186, 83 L.Ed. 167. It is likewise true that "the government will not resort to sharp practice, nor invoke technical construction or fiction, which will manifestly thwart the good-faith intention of its taxpayers, for the purpose of visiting a tax burden upon one who in fact did not, except by construction, derive any beneficial income

from the transaction." Bettendorf v. Commissioner of Internal Revenue, 8 Cir., 49 F.2d 173, 176; Randolph v. Commissioner of Internal Revenue, 8 Cir., 76 F.2d 472, 475.

■ The Federal Income Tax law also looks rather to the substance of the act or thing involved than to mere refinements of language or title. This thought was approved by the late Mr. Justice Holmes in the following language: "Taxation is not so much concerned with the refinements of title as it is with the actual command over the property taxed—the actual benefit for which the tax is paid. * * * The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916. See, also, Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055, and Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 146, 85 L.Ed. 75, 131 A.L.R. 655, in the latter of which cases it is pertinently and pointedly said: "Where the taxpayer does not receive payment of income in money or property realization may occur when the last step is taken by which he obtains the fruition of the economic gain which has already accrued to him." These considerations have recently been reaffirmed and followed in Acer Realty Company v. Commissioner, 8 Cir., 132 F.2d 512.

■ A further preliminary consideration is the fact that "a cardinal principle of federal income taxation requires annual returns and accounting; and this principle requires the determination of income at the close of the taxable year without regard to the effect of subsequent events." Penn v. Robertson, 4 Cir., 115 F.2d 167, 175. This court has not pursued that declaration to the extremity of disregarding altogether and in every relation events transpiring after December 31, 1936. (It is noted incidentally, though it is not material here, that the Hatchery's fiscal year current when the insurance was purchased in 1936 ended on August 31, 1936). To the extent that they effectuated steps initiated in 1936, they are entitled to, and have received, consideration. Nor have they been ignored in respect of their bearing upon the significance of events that occurred in 1936. However, it seems reasonable that the probative value of steps

taken after January 1, 1937, more clearly after March 15, 1937, the final day for income tax accounting for the year 1936, and especially after December 8, 1937, when the plaintiff's return for 1936 was first questioned must undergo progressive and measurable diminution.

The plaintiff urges upon the court the critical position in this study of the element of intent. Over the broad statement that the intent to achieve or not to achieve a distribution is a vital factor, there need not be direct question. But what intent is controlling and how is it to be determined? It would seem reasonable that an intent to make a distribution of corporate profits is to be affirmed in either of at least two situations. The first arises where the responsible corporate authority subjectively arrives at an express intention to make a distribution; the second when like authority resolves upon a course of action, which rightly evaluated, accomplishes a distribution, whether the determination to distribute is subjectively reached or not, or even given actual consideration. And it is the thing that is done that is most vital, to which the court must ultimately and most persuasively look in its appraisal of intent. The plaintiff's testimony in this case respecting his subjective intent has not been considered as controlling or even substantially persuasive.

Accordingly formal corporate action is not always decisive respecting the character of an alleged distribution. Thus it is said textually: "A distribution to be a dividend need not be called a dividend. The converse is true. Furthermore it is not required that there be a formal declaration by the Board of Directors. It is sufficient if the method pursued results in a distribution of earnings or profits." Paul and Mertens. Law of Federal Income Taxation, Volume 1, Section 8.13.

■ And bookkeeping entries, though surely evidentiary, are not conclusive as to the income taxation implications of a corporate action. The controlling factor is what the taxpayer did, not what he formally intended to do, nor even what he declared, by bookkeeping entries, he had done. Parks-Chambers, Inc., v. Commissioner of Internal Revenue, 5 Cir., 131 F.2d 65; Woodruff v. Commissioner of Internal Revenue, 5 Cir., 131 F.2d 429; Vesper Co. v. Commissioner of Internal Revenue, 8 Cir., 131 F.2d 200; Ruben v. Commissioner of Internal Revenue, 8 Cir., 97 F.2d 926; Helvering v. Gordon, 8 Cir., 87 F.2d 663; Rheinstrom v. Conner, D. C., 33 F.Supp. 917; Rheinstrom v. Conner, 6 Cir., 125 F.2d 790; Hirsch v. Commissioner of Internal Revenue, 9 Cir., 124 F.2d 24; Douglas v. Edwards, 2 Cir., 298 F. 229; Eaton v. English & Mersick Co., 2 Cir., 7 F.2d 54; Garvan Inc., v. Eaton, D.C., 20 F.2d 422; Lonsdale v. Commissioner of Internal Revenue, 8 Cir., 32 F.2d 537; Wiese v. Commissioner of Internal Revenue, 8 Cir., 93 F.2d 921; Anketell Lumber & Coal Co. v. United States, 1 F.Supp. 724, 76 Ct.Cl. 210; Chattanooga Savings Bank v. Brewer, D.C., 9 F.2d 982, affirmed 6 Cir., 17 F.2d 79; Hadley v. Commissioner of Internal Revenue, 59 App.D.C. 139, 36 F.2d 543; Choate v. Commissioner of Internal Revenue, 2 Cir., 129 F.2d 684; Allen v. Commissioner of Internal Revenue, 1 Cir., 117 F.2d 364; Flanagan v. Helvering, 73 App.D.C. 46, 116 F.2d 937; Harter v. Helvering, 2 Cir., 79 F.2d 12; Waggaman v. Helvering, 64 App.D.C. 371, 78 F.2d 721; Cohen v. Commissioner of Internal Revenue, 6 Cir., 77 F.2d 184; Security First National Bank v. Commissioner of Internal Revenue, 28 B.T.A. 289.

■ It must be acknowledged, too, that stockholders' withdrawals from the accumulated corporate profits are generally and presumptively regarded as dividends. Few canons of appraisal of evidence are more definitely settled. Clark v. Commissioner of Internal Revenue, 3 Cir., 84 F.2d 725; Lincoln National Bank v. Burnet, 61 App.D.C. 354, 63 F.2d 131; Christopher v. Burnet, 60 App.D.C. 365, 55 F.2d 527; Chattanooga Savings Bank v. Brewer, supra, Hadley v. Commissioner of Internal Revenue, supra; Fitch v. Helvering, 8 Cir., 70 F.2d 583. In the Fitch case, page 586 of 70 F.2d, the circuit court of appeals for this circuit says: "It is what was done, not how it was done, which is determinative of the question before us. A dividend masquerading as a gift would still be taxable, while a gift, even though disguised as a dividend, would not be." Upon somewhat the same reasoning it is held that money paid by a corporate employer to an employee is generally and presumptively wages or salary, not a gift. Fitch v. Helvering, supra; Noel v. Parrott, 4 Cir., 15 F.2d 669, certiorari denied 273 U.S. 754, 47 S.Ct. 457, 71 L.Ed. 875; Fisher v. Commissioner of Internal Revenue, 2 Cir., 59 F.2d 192.

Certain of the opinions cited in the last two paragraphs arise out of cases where the alleged distributions were made through the payment of insurance premiums on the lives of officers or employees.

However, the reported cases determining the tax consequences of the payment by a corporation of premiums upon insurance policies on the lives of their managing officers are only generally and remotely instructive here. And that is true because of the variety in the facts of the several cases. Such transactions usually involve clearly determinative facts. In varying forms, they arise either out of the procurement of ordinary business insurance, whose premiums are a corporate expense and whose cash surrender and loan values and death benefits are exclusively a corporate asset, all resulting in no personal advantage, benefit, or distribution to the insured, or out of the payment of premiums upon policies of insurance admittedly personal to the insured which results in the acknowledged receipt by the insured of an added wage or salary or of a corporate distribution. Their pertinence is also neutralized by the circumstance that, ordinarily, the policies involved require the payment of annual premiums, which are natural and usual charges against the income of the insured, whereas here the premium is paid singly and, as the plaintiff pointedly argues, partakes rather of the nature of an investment than of the nature of an annual expense, and the insurance feature is of minimum consideration in comparison with the major significance of the investment aspect.

An instructive example is Commissioner of Internal Revenue v. Bonwit, 2 Cir., 87 F.2d 764. Originally it involved three types of policies. "One group consists of policies for $175,000 which had been issued on the application of the respondent and named as beneficiaries members of his family or his estate. Premiums paid on these policies were held taxable income to him. The correctness of this ruling is no longer questioned. Another group consists of policies for $139,500 for which the corporation had made application and under which it was the beneficiary. The premiums paid on this group were held not taxable to Mr. Bonwit, and this ruling is also not disputed. A third group embracing policies in the aggregate amount of $500,000 raises the question presented here. These policies were taken out in 1923.

The applications named the corporation as the applicant for insurance and were signed both by it and by Mr. Bonwit. The insurance was applied for by the corporation for the purpose of creating greater efficiency among its officers and for the betterment of its business. Some of the policies were originally payable to the corporation, but in 1928 the beneficiaries were the respondent's wife, in policies for the face amount of $250,000, and his sons Walter and Harold, in policies for $125,000 each. The policies were in the standard form; no power to change the beneficiary was reserved. The records of the corporation contain no resolutions pertaining to the insurance policies nor any agreement between the corporation and the respondent with respect to them." Upon the facts thus outlined, the court held that the premiums for 1928 upon the policies for $500,000 were added compensation to Bonwit, the corporation's president, manager and chief stockholder. The case instructively offers in broad outline a pattern· drawing the distinctions between some of the types of insurance coverage whose premiums may be involved in controversies of this type. And it is particularly to be noted that when the case was before the Board of Tax Appeals, the Commissioner contended that the premiums on all three types of policies were taxable income to Bonwit and the Board ruled upon each item. Evidently adverse rulings by the board were accepted by Bonwit in respect of the premiums on the group of policies first mentioned, and by the commissioner in respect of the premiums on the second group of policies. Bonwit v. Commissioner of Internal Revenue, 33 B.T.A. 507. And as to the third group the court held the premiums paid to constitute taxable income received by the insured.

Golden v. Commissioner of Internal Revenue, 3 Cir., 113 F.2d 590, is cited by the plaintiff in its appearance before the Board of Tax Appeals, 39 B.T.A. 676. He also cites Cummings v. Commissioner of Internal Revenue, 1 Cir., 73 F.2d 477. But the court can not perceive the assumed parity between them and the instant action, though the cited cases are themselves quite similar. In each, a corporation had purchased the insurance, with itself as beneficiary upon the death of the insured, on the life of an officer who later died; and the corporation had erected during the life of the policy a contractual device

whereby upon the payment of the policy's proceeds distribution thereof would be made to the corporation's stockholders in proportion to their stockholdings, and the issue decided was not the status with respect to income taxation of the insurance premiums, but rather the impact of the Income Tax law upon the distribution of the proceeds of the policy to the corporate shareholders. Meanwhile, in each case the corporation had reserved in writing certain tangible and sweeping rights of control over the policy prior to its maturity as a death claim. The conclusion in each case was that the stockholders received a taxable distribution upon, and in the year of the death of the insured, and that the distribution did not antedate that year, and could not be relieved from taxation as the proceeds of insurance payable to beneficiaries. But the assumption of the instant applicability of those cases involves a petitio principii in respect of the very issues now to be resolved. There clearly the corporation reserved certain rights of alteration whereby the benefits to the stockholders did not accrue or even become prospectively certain until the death of the insured.

In Yuengling v. Commissioner of Internal Revenue, 3 Cir., 69 F.2d 971, 972, where a corporation designated as trustee by the taxpayer under an irrevocable Trust Agreement had utilized the income from the trust estate, as directed in the agreement, to pay premiums on purely private policies of insurance on the taxpayer's life, under which the beneficiaries were members of his family, it was held that the premium payments were taxable income of the taxpayer. True, emphasis was laid on the absence of benefit to the trustee. In the opinion it is significantly said: "It is the settled administrative practice to regard premiums paid by a corporation on an individual insurance policy on the life of an officer as income to the officer if he is permitted to designate the beneficiary and if the corporation is not directly or indirectly benefited thereby. George M. Adams [v. Commissioner of Internal Revenue], 18 B.T.A. 381; M. Lorling Danforth [v. Commissioner of Internal Revenue], 18 B.T.A. 1221. The payment of such premiums by the corporation must be presumed as compensation for services, rather than gifts as the petitioner contends, since a corporation cannot lawfully give away its assets" citing Noel v. Parrott, supra. To the same essential effect, when

carefully analyzed is Canaday v. Guitteau, 6 Cir., 86 F.2d 303.

Burnet v. Wells, 289 U.S. 670, 679, 680, 53 S.Ct. 761, 764, 77 L.Ed. 1439, reversing Wells v. Commissioner of Internal Revenue, 8 Cir., 63 F.2d 425, was also an insurance trust case which involved the trustee's payment of premiums on policies on the taxpayer's life for the benefit of personally designated beneficiaries. The taxability of the annual premiums against the insured was affirmed by a sharply divided court. In the prevailing opinion this discussion is found: "A policy of life insurance is a contract susceptible of ownership like any other chose in action. * * * One who takes out a policy on his own life, after application in his own name accepted by the company, becomes in so doing a party to a contract, though the benefits of the insurance are to accrue to some one else. * * * The rights and interests thereby generated do not inhere solely in those who are to receive the proceeds. They inhere also in the insured who in co-operation with the insurer has brought the contract into being. * * * Income permanently applied by the act of the taxpayer to the maintenance of contracts of insurance made in his name for the support of his dependents is income used for his benefit in such a sense and to such a degree that there is nothing arbitrary or tyrannical in taxing it as his."

It is somewhat instructive to recall that under earlier Internal Revenue Acts, corporate disbursements for premiums on life insurance policies on the life of one of its officers or employees where the corporation was not directly or indirectly the beneficiary thereof have been held to be items deductible from the corporation's gross income as additional salary, Berizzi Brothers Co. v. Commissioner of Internal Revenue, 16 B.T.A. 1307; but that such payments were ruled not to be deductible where the paying corporation was the beneficiary. Merrimac Hat Corporation v. Commissioner of Internal Revenue, 29 B.T.A. 690.

The court has given careful consideration to many cases cited by the plaintiff in which withdrawals in cash from corporate funds by chief stockholders have been held to be loans to the stockholders when that theory is supported by clear and unambiguous book entries, particularly where some note or other evidence of indebtedness is delivered by the receiver

of the advancement. But generally, such items arise where there are officers' drawing accounts into which they fall to make a harmonious pattern. And they exemplify a rather common and ordinary practice. Let it be noted too that, even there, the obligation rests on the receiving shareholder to rebut by competent and persuasive evidence the inference of his receipt either of salary or of a distribution.

Two Board of Tax Appeals cases cited by the plaintiff may be noted with interest. In McReynolds v. Commissioner of Internal Revenue, 17 B.T.A. 331, no taxable distribution was charged against the chief owner of the stock of a Washington, D. C., Automobile Sales Corporation, in whose name title was taken to a site on which a business block was built for the use of the corporation's business, though in part the funds for the acquisition of the site and the construction work came from the corporate assets. But the exclusive corporate character and purpose of the investment seem from the report to have been obvious at all times. The venture was in its nature a corporate project. In Moorshead v. Commissioner of Internal Revenue, 28 B. T.A. 252, the commissioner attempted unsuccessfully to tax as a distribution to a stockholder a corporate investment by a Newton, Kansas, corporation in a show farm near Newton, Kansas, and the elaborate improvements upon it, and rested his claim upon the two circumstances that for a time during the taxable year, the title to the land had stood in the name of the stockholder and that the stockholder also leased the property from the corporation for a rental that was something less than adequate. But the Moorshead case is manifestly inapplicable here for in it, the title to the land was originally taken in the name of the corporation's attorney who was at most only a naked trustee of it for the corporation, and upon his conveyance of title to the stockholder, the latter, within the taxable year made and delivered to the corporation a valid conveyance under the Kansas laws of the farm; and as to any advantages arising from his modest rental obligations, the board considered them to be neutralized by certain burdens upon him which the operation of the place entailed.

Appraised by the test of a taxable distribution as it is defined generally in the act and more specifically applied in the reported cases, the facts in this record surely can not be said to be free from difficulty or to point to a single necessary or infallible conclusion. The court freely acknowledges that the group of numbered facts first cited in this memorandum are at least somewhat indicative of an intention on the part of the plaintiff that the Hatchery should retain some measure of interest, however ill defined, in the policies. At least, they may be regarded as pointing to the want of any really considered analysis by the plaintiff, either as an individual or as the Hatchery's absolute operator, of the trend and consequences of his corporate and individual act.

But the group of considerations subsequently enumerated seem to the court clearly to have the more decisive probative value and to compel the conclusion that out of the purchase of the policies, the plaintiff received a taxable distribution. Some, though not all, of them will be considered briefly.

And first, there are the procurement and the form of, and the initial designation of beneficiaries under, the policies themselves. Standing alone, they are utterly unequivocal and allow only the conclusion that they, and their benefits, are strictly personal to the plaintiff. The applications were entirely individual. The policies bear no intrinsic mark of any corporate interest in any single one of their benefits but on the contrary designate the executors or administrators of the insured as their initial beneficiaries in the event of their maturity as death claims.

But the first redesignation of beneficiary under each policy is even more convincing. Thereby, the plaintiff diverted the ultimate benefits in case of his death, in small measure and then only contingently to one of his children, and subject thereto, entirely to the Alliance, the religious institution to which he was devoutly attached. Acknowledging the worthiness of the religious and charitable impulse by which he was prompted to his action, it was intimately personal to himself, utterly foreign to the corporate entity of the Hatchery. It put both policies into a position, in consequence of which and of the death of the insured every element of value in the policies as they then, and until long after the end of 1936, stood, would have passed to one of his sons and his favorite church institution. And it occurred so nearly at the time of the issuance of the

policies and so early after his elimination of any material alien stock ownership in the Hatchery that the conclusion is irresistible that the purpose underlying it was present when the policies were secured. More seriously still, the redesignation of beneficiary under the earlier policy was actually requested forty days and assented to thirty-two days, before the later policy was requested and written. And therein is a circumstance which, in the court's estimation conclusively repels any possible inference from the testimony of the agent of the insurance company, that he considered he was writing policies of insurance of an industrial or corporate character. Not later than June 1, 1936, he knew better. That conclusion seems to be ineluctible. The concurrence of this redesignation with the plaintiff's general plan to divert the entire hatchery business, being the principal asset of his estate, to the ownership and purposes of the Alliance is also persuasive, as is the circumstance that from the date of its redesignation as beneficiary under each policy, the Alliance remained the specified beneficiary until a short time before the policy's surrender and conversion into cash, in the case of the second policy until September 30, 1940.

Unlike most cases in which some corporate interest in an otherwise apparently personal policy of insurance is reserved, there is here no written assignment or other formal declaration of interest in the corporation paying the premiums. Nowhere did the plaintiff, by written instrument, expressly assure to the Hatchery any right in the policies, either to pledge them for a loan, to surrender them for their cash value, or to redesignate beneficiaries; least of all the last right, for the plaintiff positively denied any such corporate right by an almost immediate redesignation of a character beyond any interest or concern of the Hatchery. So, when the taxpayer argues from the premise that the Hatchery retained and enjoyed those rights, he assumes a corporate right of which there is no formal reservation or grant, and that in direct negation of the unambiguous provisions of the policies themselves.

The court is not neglecting the circumstances of a possibly contrary import, chief among which are the entries on the Hatchery's books showing the charges to cash surrender value and insurance expense as against the two checks; the financial statements, and income tax returns; the subsequent negotiation by the plaintiff of loans upon the policies whose proceeds were delivered at once to the Hatchery by which any loan repayment was made, together with the delivery to the Hatchery of the funds received in 1938 and 1940 on final conversion of the policies, and the Hatchery's consistent bookkeeping entries upon all these transactions. But these factors, in the circumstances appear to be either indecisive or of only slight probative value.

The initial bookkeeping entries, bank statements and tax returns are regarded as only indecisive and creative of ambiguity. True, they would have been sufficient to estop the Hatchery and the plaintiff to question their accuracy, as against any third persons who might have relied upon them as, for example creditors and purchasers of new stock, acting with knowledge of and in reliance on them. And this would include the bank which made some loans to the corporation. But the court is not impressed by the assertion in the testimony of the Vice-president of that bank that the Hatchery's borrowings would have been unwelcome to the bank without the cash surrender value of life insurance in the Hatchery's balance sheet. These loans never exceeded in the aggregate $15,250 and reached that total only on one occasion during the brief peak requirement period of the Hatchery in 1937, when its movable stock in trade was approaching its annual crest. And it may be remembered, too, that all the evidence before the court shows the Hatchery to have remained free from secured obligations and any substantial unsecured debts. The credit allowed was manifestly not indiscreet quite irrespective of the status of the item of insurance value. But no issue of estoppel is involved here and the entries and statements may be considered only to the extent that they define and explain the transaction actually had.

The actual negotiation of loans began at the earliest on August 19, 1937, more than five months after the end of the income tax reporting period for 1936, and of course, the earlier policy surrender was substantially after the issue now tried had been brought home to the plaintiff. On that score they are regarded as of minor

184

probative significance. Nor is the utilization for the Hatchery's benefit of the loan privileges of the policies more than slightly convincing. The sole ownership of the Hatchery's stock by the plaintiff coupled with his exclusive management of its operations was a sufficient motive for his employment of his personal assets and credit in its interest. Such a practice is so notoriously common that it might easily have been presumed and anticipated here.

Without further elaboration it may be stated that upon a careful review of the testimony and documentary evidence in the case, the court feels compelled to conclude that a taxable distribution was received, under the facts, by the plaintiff. Under those facts, despite book entries and statements unsupported by the policies or by any contractual declaration of the plaintiff, he acquired, and utilized to the last extremity that "unfettered command" over corporate property which the cases propose as the critical test of distribution. Corliss v. Bowers, supra. He did those things intentionally and purposefully, though perhaps without any adequate appraisal of their ultimate consequence. Certainly there is no evidence of any prior or contemporary consideration on his part of the income tax impact of his dealings. It may be added that the case involves no suggestion of any deliberate tax evasion or avoidance device. And, prescinding from the inference of fraud upon the natural rights of his family, there is no question of designing fraud or concealment in any of the plaintiff's dealings.

The plaintiff's action is, therefore, being dismissed by a formal order entered concurrently with the filing of this memorandum; and in accordance with findings of fact and conclusions of law prepared by the court, with the assistance of formal requests made by the parties. In the conviction that the findings ought justly to reflect those facts favorable to the plaintiff to which others than the writer hereof might conceivably attach weight sufficient to incline the balance of judgment in his favor, the court has endeavored to make the findings of fact relatively comprehensive. They include virtually all of the facts, strictly so called, which the plaintiff has urged the court to accept. They do not, however, adopt several of the conclusions from naked facts which are insisted upon by the plaintiff.